D. EDWARD HAYS, #162507
ehays@marshackhays.com
TINHO MANG, #322146
tmang@marshackhays.com
DEVAN DE LOS REYES, #355913
ddelosreyes@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Debtor,
PALO VERDE HEALTHCARE DISTRICT

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>PALO VERDE HEALTHCARE DISTRICT,<br><br>    Debtor. | Case No. 6:25-bk-17084-SY<br><br>Chapter 9<br><br>EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO POST-PETITION FINANCING AGREEMENT UNDER 11 U.S.C. § 364 AND FOR GRANTING OF A SUPER-PRIORITY LIEN ON PERSONAL PROPERTY<br><br>**Hearing (specially approved by the Court):**<br>Date:        December 9, 2025<br>Time:        10:00 a.m.<br>Ctrm:       302<br>Location:  United States Bankruptcy Court<br>                 3420 Twelfth Street<br>                 Riverside, CA 92501 |

/ / /

/ / /

**TABLE OF CONTENTS**

1.    Summary of Argument ................................................................2

2.    Statement of Facts ..................................................................3

3.    Legal Argument .....................................................................6

      A.    The Intergovernmental Transfer Program ...................................7

      B.    There is good cause for the Court to approve the post-petition financing. ...................9

4.    Conclusion ........................................................................11

Declaration of Carmela Garnica ........................................................13

Request for Judicial Notice ...........................................................16

**TABLE OF AUTHORITIES**

**Cases**

*Bomar v. Bayfront HMA Medical Center, LLC*,

   2023 U.S. Dist. LEXIS 227114 at *6-8 (M.D. Fla. January 24, 2023) ............................ 7

*County of Orange v. Merrill Lynch & Co. (In re County of Orange)*,

   191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) ................................................. 9

*In re Ames Department Stores, Inc.*,

   115 B.R. 34, 38-39 (Bankr. S.D.N.Y. 1990) .................................................. 9

*In re Defender Drug Stores*,

   145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ................................................... 9

**Statutes**

11 U.S.C. § 364(c)-(f). .................................................................7

11 U.S.C. § 901 ........................................................................10

11 U.S.C. §§ 364(c), 364(d), and 364(e) .................................................9

42 C.F.R. § 433, Subpart B (§§ 433.50-433.74) ...........................................7

42 C.F.R. § 433.51 ....................................................................7, 9

42 C.F.R. § 433.54 .....................................................................7

MOTION TO AUTHORIZE POST-PETITION FINANCING

42 C.F.R. § 433.54(a) .................................................................................................................. 8

42 C.F.R. § 433.66(b)(1) .............................................................................................................. 7

42 U.S.C. § 1396b ........................................................................................................................ 7

42 U.S.C. § 1396b(a)(1) ............................................................................................................... 7

42 U.S.C. § 1396b(w)(1)(A)(i) ..................................................................................................... 7

California Government Code § 54956.8 ....................................................................................... 10

WIC § 14164(a) ............................................................................................................................ 8

WIC § 14164(b)(1) ....................................................................................................................... 8

**Other Authorities**

Alston & Bird, States May Be Looking to Balance Budgets on the Backs of Medicaid Health Plan

    Reserves, pg. 2 ....................................................................................................................... 8

Federal Register publication, 72 FR 29748 (5/29/2007) ............................................................. 8

MOTION TO AUTHORIZE POST-PETITION FINANCING

1  TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE, THE

2  OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

3      Palo Verde Healthcare District ("Debtor" or "District"), a special hospital district established

4  pursuant to California Health & Safety Code § 32000 *et seq.*, which operates the Palo Verde

5  Hospital located in Blythe, California, files this motion and respectfully represents as follows:

6  ## 1.    Summary of Argument

7      The Debtor filed this bankruptcy petition on September 30, 2025, after an emergency

8  reduction in the scope of its services which resulted in the closing of inpatient services, the med-surg

9  unit and surgery services at the hospital and a reduction in open days at the community clinic. The

10  Debtor currently only has very limited financial reserves, and maintains only emergency medical

11  services and separate services at a clinic four days a week. Since the filing of the petition, the Debtor

12  has attempted to restabilize its finances by rebuilding its cash reserves through collecting receivables

13  and implementation of significant cost cutting measures under the 60-Day Emergency Plan and

14  declaration of fiscal emergency. These efforts have worked to slow the District's cash burn but will

15  not fully work to unwind the District's declaration of fiscal emergency that led to the filing of this

16  case.

17      Before and during this bankruptcy, the Debtor has also sought to obtain operating credit on

18  an unsecured, administrative basis or on a secured basis. To date, the Debtor has not had any

19  success. The Debtor has been informed that its real and personal property holdings are not sufficient

20  to obtain a significant advance of operating funds.

21      Prior to bankruptcy, the Debtor participated in a voluntary State of California Medi-Cal

22  program known as the Voluntary Rate Range Program ("Program"), which has provided a

23  significant source of non-operating revenue through intergovernmental transfers ("IGT") annually

24  since COVID-19. These transfers are payments transferred between governmental agencies to

25  enhance federal matching benefits received by the state (discussed in greater detail *infra*), which are

26  then distributed amongst IGT participants. The Debtor currently has an opportunity to again

27  participate in the IGT program.

28

MOTION TO AUTHORIZE POST-PETITION FINANCING

At the Debtor's request, it has obtained a one-time, final extension of the deadline to fund its voluntary IGT commitments which date is December 11, 2025. If the Debtor can fund $3,458,840 into the Program, the District is informed that it will receive an estimated gross payout of $9,926,130, resulting in an estimated net benefit of $6,480,535. Historically, the IGT payments from participation in this Program have been received within 30-90 days of funding. If the Debtor is able to fund its IGT commitments to receive these Program payouts, it will receive a large infusion of funds which are unavailable from any other source and can balance its 2025-2026 operating budget for adoption. The District is currently operating under a carryforward budget less reductions from its fiscal emergency under a continuing resolution.

The number of lenders who understand the IGT program are very limited. The Debtor only received one offer to provide financing for the Debtor's IGT commitments, from Alleon Capital Partners, LLC ("Lender"). The Lender is willing to provide a loan of up to $4,000,000 (which covers the entire IGT commitment plus an additional amount available for working capital) if the Court enters an order approving the loan and granting the Lender the protections set forth in 11 U.S.C. § 364 as described in more detail, below.

The Debtor respectfully requests that the Court grant this Emergency Motion and approve the loan, which will provide funding in an amount estimated to be sufficient to ensure the Debtor's continued operations through the end of the 2025-2026 fiscal year and into the next fiscal year. This will allow the Debtor sufficient funds to further restructure its operations, finances and debts and submit a Plan of Adjustment for continued operations into the future.

## 2. Statement of Facts

On January 27, 1948, the Palo Verde Healthcare District (the Debtor) was formed as a special hospital district which officially encompasses approximately 1,000 square miles of the easternmost region of Riverside County, extending to the California-Arizona border.

Debtor owns and operates the Palo Verde Hospital ("Hospital"), an accredited Critical Access Hospital located at 250 N. 1st Street, Blythe, CA and a rural health clinic.

The Debtor has been in financial trouble for a number of years. But, over the past approximate five-year period, it has repeatedly received one-time funds including COVID related

grants, IGT Funds, incentive payments, and more than $9 million in loans from the California Health

Facilities Financing Authority ("CHFFA"), which is the Debtor's largest creditor claim. CHFFA's

loans are secured by a limited security interest in 20% of the Debtor's Medi-Cal checkwrite (i.e.

funds paid by Medi-Cal), and such security interest is perfected by the recordation of a UCC-1

financing statement, number U230084581022 filed on November 29, 2023.  A true and correct copy

of the filed financing statement is attached to the Request for Judicial Notice ("RJN") as Exhibit "2."

In May 2025, the Debtor's local banking partner, Provident Bank, terminated its line of credit

and setoff what it was owed from funds on deposit in the Debtor's bank account. Without a line of

credit and with substantially less available cash after the setoff, the Debtor was forced to primarily

rely on timely collections of its receivables in order to fund its ongoing operational expenses. After

drastic scale backs to its services in the past fiscal year, the Debtor has reduced its monthly

operational expenses to approximately $1.2 - $1.5 million, and only currently operates its 24/7

emergency department, related auxiliary services and the community clinic.  No inpatient or surgical

services are provided at this time.  Those patients are now being transferred to facilities nearly 100

miles away in those circumstances. The emergency room operations have a total of seven beds.

Additionally, the hospital building that the Debtor owns is not currently in compliance with

seismic safety building standards for licensed acute-care hospitals under California law. The

deadline to improve the structure has not yet passed. The structures comprising the Hospital will

require significant capital improvements in order to meet seismic safety standards; however, due to

the Debtor's dire financial condition, the exact cost of these improvements is not currently known

and there is no expectation that the improvements could be made without outside assistance. The

District plans to file for the allowed extensions to complete these improvements.

Due to its liquidity crunch, the Debtor has not been able to pay all of its debts as they come

due, and is reserving as much of its operating cash as possible in order to continue to fund payroll

and essential goods and services to continue to provide emergency room care for its service area.

Because the Debtor does not have a substantial cash reserve, if it paid all of its outstanding vendors

and service debts, it would immediately run out of operating cash.

In order to preserve its current operations and maintain, to the greatest extent financially feasible, a sufficient standard of patient care, the board of directors for the Debtor authorized, in a majority vote, this Chapter 9 bankruptcy case to be filed. Three directors voted in favor of the filing, one voted against, and one abstained.

The bankruptcy petition was filed on September 30, 2025.

On October 2, 2025, as Dk. No. 5, the Debtor filed a motion to set certain case procedures and deadlines, including a deadline to file an objection to eligibility ("Procedures Motion"). The Procedures Motion was granted without opposition, and no party timely filed an objection to eligibility.

On November 19, 2025, a special board meeting of the District's board was conducted, where the IGT commitments were discussed and various parties in interest were invited to make presentations to the board.

The original deadline to fund the IGT commitment was November 21, 2025. The California Department of Healthcare Services ("DHCS") provided, via e-mail, a one-time extension of the deadline for the Debtor to fund its IGT commitments to December 11, 2025. A true and correct copy of this e-mail extension from DHCS is attached to the Declaration of Carmela F. Garnica ("Garnica Declaration") as Exhibit "3."

On November 24, 2025, the Debtor received a term sheet from the proposed Lender.

On November 25, 2025, the Debtor's board convened another special meeting[1] and, at that special meeting, authorized the Debtor to take all steps necessary to consummate and enter into the loan with Lender, including that the term sheet received from Lender was executed the next day. A true and correct copy of the executed term sheet is attached to the Garnica Declaration as Exhibit "4."

---

[1] The special meeting agenda packet accessible to the public and published prior to the meeting can be found here: https://paloverdehospital.org/ArchiveCenter/ViewFile/Item/1517. The staff report describing the Intergovernmental Transfer funding summary can be found starting on page 18 of 24 of the special meeting packet. This staff report further disclosed to the public the identity of the lender and the general terms of the loan.

On December 2, 2025, as Dk. No. 36, the appointed patient care ombudsman filed his initial report. The ombudsman's initial report did not indicate that the ombudsman had an opinion that the hospital had a poor standard of care for patients.

At a hearing held on December 3, 2025, the Court announced its ruling to enter an order for relief after no party objected to the Debtor's eligibility by the November 7, 2025, deadline.

## A.    Summary of Loan Terms

The specific terms of the proposed loan between Debtor and Lender are set forth in the draft Agreement attached to the Garnica Declaration as Exhibit "1." THE FOLLOWING SUMMARY IS FOR REFERENCE PURPOSES ONLY AND DOES NOT SUPERSEDE ANY TERM IN THE AGREEMENT.

**Maximum Funding:** $4,000,000

**Term**: 12 months

**Interest Rate:** 2.5% for each 30-day period on amount outstanding (i.e. 30% per annum), paid on the first of each month

**Underwriting Fee:** 2.0% of the maximum amount (deducted from funding amount)

**Expense Deposit:** $45,000 (already paid by Debtor)

**Security Interest:** All Collateral as defined in the Agreement, consisting generally of all personal property of the Debtor, including the Debtor's right to receive funds from the IGT program.

## 3.    Legal Argument

Section 364(c), 364(d), 364(e), and 364(f) apply in a Chapter 9 case. 11 U.S.C. § 901(a).

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3) secured by a junior lien on property of the estate that is subject to a lien.

(d)    (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

(f) Except with respect to an entity that is an underwriter as defined in section 1145(b) of this title, section 5 of the Securities Act of 1933, the Trust Indenture Act of 1939, and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.

11 U.S.C. § 364(c)-(f).

## A.    The Intergovernmental Transfer Program

Federal law requires the Secretary of Health of Human Services to pay each state a vast array of funds as described in 42 U.S.C. § 1396b, on a quarterly basis, which is referred to as Federal Financial Participation ("FFP"). The federal government calculates the amount due to each state based on, *inter alia*, showing of the state's "total amount expended during such quarter as medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1); *see Bomar v. Bayfront HMA Medical Center, LLC*, 2023 U.S. Dist. LEXIS 227114 at *6-8 (M.D. Fla. January 24, 2023) (explaining generally the structure of Medicaid funds matching). Federal regulations for the implementation of this federal funding participation govern the permissibility of State funds used in this program. See, 42 C.F.R. § 433, Subpart B (§§ 433.50-433.74). Generally, federal regulations allow "Public Funds" to be "considered as the State's share in claiming FFP" if they are "appropriated directly to the State or local Medicaid agency, or are transferred from other public agencies… or certified by the contributing public agency as representing expenditures eligible for FFP under this section" and "[t]he public funds are not Federal funds." 42 C.F.R. § 433.51. Additionally, a State may receive "bona fide donations" as defined in 42 C.F.R. § 433.54 from allowable participants to obtain the federal funding match. *See* 42 C.F.R. § 433.66(b)(1); *see also* 42 U.S.C. § 1396b(w)(1)(A)(i) (provider-related donations reduce federal payments unless those are "bona fide provider-related donations."). For a donation to qualify as a "bona fide donation," it must have "no direct or indirect

relationship… to Medicaid payments" made to the donor. *See* 42 C.F.R. § 433.54(a).[2]

California implements this FFP program through the Department of Healthcare Services ("DHCS") and California's Medicaid State Plan.[3] Pursuant to California Welfare & Institutions Code § 14164(a), certain other governmental entities are permitted to transfer funds to the State "in support of the Medi-Cal program," and "[t]hose transfers may consist of cash or loans to the state." WIC § 14164(a). "Participation in intergovernmental transfers under this subdivision is voluntary on the part of the transferring entity for purposes of all applicable federal laws." WIC § 14164(b)(1).

The Debtor has participated in various IGT programs for a number of years and the Voluntary Rate Range Program for the past two years. This will be its third year to participate. The first time was through an IGT Agreement with the Inland Empire Health Plan ("IEHP"). In the second year, Molina Healthcare of California ("Molina") also participated, which had the following return on investment: Debtor transferred a combined amount of approximately $2.5 million to IEHP and Molina last year, and received a gross return of $7.1 million. The IGT contribution was funded partially by the District's cash and the District's Line of Credit with Provident Bank. These funds represented a significant portion of the funds expended last year by the Debtor. This year, the Debtor submitted letters of interest to DHCS to provide IGT contributions through IEHP, Molina, and Kaiser Permanente ("Kaiser"). The Debtor is informed that these contributions will result in the following estimated payouts which result from the Federal Funds Participation described above:

| Partner | District Contribution | Est. Payout | Est. Net Benefit |
|---------|----------------------|-------------|------------------|
| IEHP | $2,508,103 | $7,271,101 | $4,770,622 |
| Molina | $800,895 | $2,280,029 | $1,479,874 |

---

[2] HHS, Centers for Medicare & Medicaid Services ("CMS") explains that states should not be permitted to "recycle" Medicaid (i.e. federal) funds to obtain more federal funding. *See* Alston & Bird, States May Be Looking to Balance Budgets on the Backs of Medicaid Health Plan Reserves, pg. 2, available at: https://www.alston.com/-/media/files/insights/publications/2017/11/medicaid-health-plan-reserves-1.pdf (summarizing the "recycling" policy as stated in an extremely lengthy Federal Register publication, 72 FR 29748 (5/29/2007), available at: https://www.federalregister.gov/documents/2007/05/29/07-2657/medicaid-program-cost-limit-for-providers-operated-by-units-of-government-and-provisions-to-ensure).

[3] Available at: https://www.dhcs.ca.gov/formsandpubs/laws/Pages/californiastateplan.aspx

MOTION TO AUTHORIZE POST-PETITION FINANCING

| | | | |
|---|---|---|---|
| Kaiser | $149,842 | $375,00 | $225,452 |
| Total | $3,458,840 | $9,926,130 | $6,475,948 |

In short, the Debtor's participation in this IGT program with DHCS allows it to receive additional state and federal funds to the upper end of the Medicaid rate range for Medi-Cal dollars, that it would not otherwise receive or have available to it. Such funds amount to several million dollars that it would be unable to generate or obtain from any other source. There are no regulations that the Debtor is aware of which expressly prohibit the use of borrowed funds to make any provider-level donations. Under state and federal statute and regulations, the only requirements are that the contributions constitute local transfers of non-Federal dollars under 42 C.F.R. § 433.51 or "bona fide donations" under 42 C.F.R. § 433.54 which do not consist of recycled Medicaid (i.e. Medi-Cal) funds. Therefore, the Debtor has no reason to believe that the use of funds from Lender to satisfy its voluntary IGT payment commitments would be impermissible. The source of the funds contemplated here is also not in violation of any contractual term that the Debtor is aware of, including the contract between the Debtor and DHCS.

## B.    There is good cause for the Court to approve the post-petition financing.

"Section 901 also applies §§ 364(c), 364(d), and 364(e) to a chapter 9 bankruptcy. These three sections extend priority to creditors of the chapter 9 debtor who are willing to provide a debtor with additional credit… § 364(c) grants a 'superpriority' status for an entity extending credit to the debtor if a debtor is unable to obtain credit under other provisions of the Code." *County of Orange v. Merrill Lynch & Co. (In re County of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996). Under Section 364, courts "have regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364." *In re Defender Drug Stores*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992). Additionally, "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender." *Id.* at 317 (citing *In re Ames Department Stores, Inc.*, 115 B.R. 34, 38-39 (Bankr. S.D.N.Y. 1990) ("Moreover, a

1  proposed financing will not be approved where it is apparent that the purpose of the financing is to

2  benefit a creditor rather than the estate.")).

3       Section 364(a) and (b) are not applicable in Chapter 9. *See* 11 U.S.C. § 901. Additionally, the

4  Debtor has been unable to obtain sufficient grants, loans, or other financial funding commitments

5  from federal, state, county, or local/city agencies to continue to sustain its operations, and certainly

6  no other source which will provide upwards of $6 million in net proceeds from federal funding

7  matches. In the Debtor's business judgment, the monthly interest rate of 2.5% (which equates to

8  30% per annum), is appropriate under the circumstances, as the loan is a short-term loan and the

9  debtor is in Chapter 9 bankruptcy which poses a very high risk for the Lender.  Debtor acknowledges

10  its financial situation and that the rate is commensurate to the risk involved in the borrowing.

11       The Debtor has limited funds on hand (and its finances are publicly disclosed in regular

12  board meetings), and it has no available personal property collateral worth more than $4 million on

13  an immediate, short-term basis. The Debtor is unable to encumber its real property without

14  substantial public notice under California Government Code § 54956.8 and even if it could

15  encumber such real property (i.e. the hospital building), the value of the building and land is greatly

16  uncertain - and not known to be greater than $4 million in any event.[4]

17       After multiple parties declined to extend credit on any other terms to the Debtor (and, as

18  noted above, Provident Bank terminated the Debtor's line of credit[5] in May 2025), it was only this

19  Lender who was willing to engage in this transaction with the Debtor, because of its understanding

20  and familiarity with the IGT program. The Lender informed the Debtor that it had successfully

21  financed another IGT transaction in another state. Therefore, good cause exists for this Court to

22  approve the terms of the loan with Lender, which will provide short term financing, secured

23  principally by the IGT funds (but also by liens on the Debtor's personal property that do not prime

24  any other lender), that will provide over $6.0 million dollars of unencumbered net benefit to the

25  Debtor, after deducting the cost of the financing. Should the Debtor not secure these funds it

26

27  _____

[4] A commercial appraisal has been ordered. However, Debtor has been informed by potential

28  interested parties that the building and land are not substantially valuable, especially in light of the
deferred maintenance of the building, which was first built over 70 years ago.
[5] Funds from the line of credit were used for the December 2024 IGT contribution.

ultimately may close within a number of months while in Chapter 9 bankruptcy adding further complications to its restructuring.

## 4.    Conclusion

For the orderly administration of this Chapter 9 case, Debtor requests that this Court grant this Motion and enter an order:

1.    Granting this Motion;

2.    Determining that the Debtor is permitted to obtain the loan as described in the agreement attached as Exhibit "1" and use the proceeds of such loan to fund its voluntary intergovernmental transfer commitments to IEHP, Molina, and Kaiser to obtain federal matching funds;

3.    Authorizing the Debtor, through its agents and authorized persons, to take any and all steps necessary to complete the Debtor's obligations under the Agreement, including if necessary creating a separate lockbox banking account and entering into a deposit account control agreement pursuant to the Agreement;

4.    Pursuant to 11 U.S.C. § 364(c)(1), granting Alleon Capital Partners, LLC, a super-priority administrative claim with priority over all administrative expenses in an amount equal to such amounts funded by Alleon on or before December 10, 2025, plus contractual interest thereon;

5.    Pursuant to 11 U.S.C. § 364(c), granting Alleon Capital Partners, LLC a super-priority security interest in any and all personal property of the Debtor to secure repayment of the loan obligations under the Agreement, **except for** any funds derived from Medicaid, including any and all Medi-Cal funds owed to Debtor. For the avoidance of doubt, the Debtor does not request that the Court supersede the existing security interest of any lienholder including the California Health Facilities Financing Authority ("CHFFA") which has a security interest in certain Medi-Cal funds owed to the Debtor; and

/ / /

/ / /

6.    Granting to Debtor such other and further relief as the Court may deem just and proper.

DATED: December 5, 2025                MARSHACK HAYS WOOD LLP

By: */s/ D. Edward Hays*
         D. EDWARD HAYS
         TINHO MANG
         DEVAN DE LOS REYES
         Attorneys for Debtor,
         PALO VERDE HEALTHCARE DISTRICT, a
         Special Hospital District

MOTION TO AUTHORIZE POST-PETITION FINANCING

# Declaration of Carmela Garnica

I, CARMELA F. GARNICA, say and declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      I am the President of the board of directors for the Palo Verde Healthcare District, a special hospital district ("Debtor"). I have been the President since October 9, 2024.

4.      I have personal knowledge of the facts set forth in this Declaration, and if called upon to do so, I could and would competently testify to these facts, as to other matters I have knowledge based on information and belief. I have participated in regular and special meetings of the board of directors discussed herein and have been authorized by the board of directors to obtain a loan with Alleon Capital Partners, LLC, on the terms described herein. A true and correct copy of the draft loan documents is attached as Exhibit "1."

5.      Through my review of the Debtor's finances with the Debtor's professionals, I am familiar with the financial condition of the Debtor. I am informed that the Debtor has less than $500,000 of available cash on hand as of December 4, 2025, and working capital is insufficient to maintain operations into the future, and without a significant infusion of further funding, the Debtor is likely to cease operations in the next few months.

6.      The Debtor has been trying to find post-petition financing since the commencement of this case, through its professionals. I am informed that the following entities were contacted by the Debtor's professionals, without any financing offers: GlassRatner, Hilco, Intrepid Investment Bankers, the U.S. Healthcare Capital Markets division of Colliers International, Keller Williams, American Advanced Management, Gordon Brothers, SLR Healthcare, Business Capital San Francisco (BizCap), Onyx Asset Advisors, Charles, Franc & Associates, Inc., Western Alliance Bank, Hilltop Securities, the California Health Facilities Financing Authority, and the State itself. Riverside County graciously extended the Debtor an advance of the annual property tax revenue but informed the Debtor that the County would not be in a position to provide any further financing under the current conditions. No other funding has been forthcoming.

7.      For the past two years, the Debtor has made voluntary intergovernmental transfer ("IGT") contributions to the Department of Healthcare Services ("DHCS"), through an IGT agreement for the Voluntary Rate Range Program with the Inland Empire Health Plan ("IEHP").and Molina Healthcare of California ("Molina") For example, last year, the Debtor contributed approximately $2,500,000 to DHCS and in return, IEHP and Molina provided approximately $7.1 million to the Debtor, which constituted a very significant part of the Debtor's annual budget. Without this IGT funding, it is very likely that the Debtor would have shut down months ago.

8.      This year, the Debtor attempted to expand its participation in the IGT program, through entering into an additional agreement with Kaiser Permanente ("Kaiser") this year, in addition to keeping its prior agreement with IEHP and Molina. I am informed that the collective contribution amount voluntarily pledged by the District is $3,458,840 and the estimated gross payout is $9,926,130. I am informed and believe that these figures are commensurate with the historical payouts from this program.

9.      I am informed that the deadline originally provided to the Debtor to fund the IGT commitments was November 21, 2025. However, DHCS provided a one-time extension of the deadline for the Debtor to make its IGT contribution, to December 11, 2025. A true and correct copy of the e-mail from DHCS is attached as Exhibit "3."

10.      After the Debtor's banking partner, Provident Bank, terminated the Debtor's line of credit in May 2025, it has been very difficult for the Debtor to obtain any funding or financing from external sources. I am informed that the Debtor's professional team spent these past few months after the filing of the bankruptcy case on September 30, 2025, seeking interested parties to provide "debtor in possession" financing offers, but the only offer that was ever received was from Alleon Capital Partners, LLC, on November 24, 2025.

11.      At a special meeting of the board of directors on November 25, 2025, the board members present at that meeting voted unanimously to authorize myself and the Chief Executive Officer to take all steps necessary to enter into the loan agreement with Alleon and to consummate the Debtor's obligations under that agreement. The term sheet that I executed on November 26, 2025, is attached as Exhibit "4."

12.     On December 3, 2025, the Debtor's counsel received the proposed loan documents.

13.     This Emergency Motion is being filed at the earliest possible time after obtaining the proposed commitment and obtaining approval from the board.

14.     If the proposed loan is not approved, the Debtor will be unable to participate in the IGT program by the December 11, 2025, deadline. If this were to occur, the Debtor's ability to continue operating will be substantially impaired.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 5, 2025.

CARMELA F. GARNICA

MOTION TO AUTHORIZE POST-PETITION FINANCING

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Request for Judicial Notice

The Palo Verde Healthcare District ("Debtor") hereby requests, pursuant to Federal Rule of

Evidence 201, that this Court take judicial notice of the following publicly available records

| Exhibit 2 | UCC-1 financing statement, number U230084581022 filed on November 29, 2023 with the California Secretary of State. |
|-----------|---|

DATED: December 5, 2025          MARSHACK HAYS WOOD LLP

By: */s/ D. Edward Hays*
      D. EDWARD HAYS
      TINHO MANG
      DEVAN DE LOS REYES
      Attorneys for Debtor,
      PALO VERDE HEALTHCARE DISTRICT

Exhibit "1"

## LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** is entered into as of December [   ], 2025 by and among **PALO VERDE HEALTHCARE DISTRICT**, a local healthcare district operating under California Health & Safety Code § 3200 et seq. (individually or collectively, "**Borrower**"), and **ALLEON CAPITAL PARTNERS, LLC**, a Delaware limited liability company ("**Lender**"). Lender and Borrower are sometimes collectively referred to as the "**Parties**".

### RECITALS

A.      Borrower has requested that Lender provide financial accommodations to Borrower as more fully set forth herein and in the Loan Documents.

B.      Lender will be making discretionary advances to Borrower, in amounts up to the Borrowing Base.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

### AGREEMENT

1.      Certain Definitions and Index to Definitions.

1.1      Definitions.   All other terms contained in this Agreement that are not specifically defined herein shall have the meanings provided in the UCC to the extent the same are used herein.  As used herein, the following terms shall have the following meanings:

1.1.1   "**Advances**" – See Section 2.1.1 hereof.

1.1.2   "**Agreement**" – This Loan and Security Agreement, together with all exhibits and schedules hereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, or replaced.

1.1.3   "**Allowable Amount**" – the lesser of (i) the Borrowing Base, (ii) the Maximum Amount.

1.1.4   "**Assurances**" – Collateral, a guaranty or a letter of credit from an entity so that Lender reasonably believes in good faith that the likelihood of loss resulting from the Third Party Claim is remote.

1.1.5   "**Authorized Officer**" - The President and Chief Executive Officer of Borrower, as authorized in a motion of the Board on November 24, 2025, and each other Person designated from time to time by the President or Chief Executive  Officer of Borrower in a notice to Lender, which designation shall continue in force and effect until terminated in a notice to the Lender from the President or Chief Executive   Officer of Borrower.

1 of 34

EXHIBIT 1, PAGE 17

1.1.6   "**Avoidance Claim**" - any claim that any payment received by Lender from or for the account of an Account Debtor is avoidable under the United States Bankruptcy Code or any other state or federal debtor relief statute.

1.1.7   "**Bank Account**" – A deposit account at Borrower's Bank established for the purpose of depositing all proceeds of IGT Accounts.

1.1.8   "**Borrower**" – see Preamble hereof.

1.1.9   "**Borrower's Bank**" – Borrower's depository bank located in the United States, which is a party to a Deposit Account Control Agreement.

1.1.10   "**Borrowing Base**" – 50% of the Estimated Collectable Value of Eligible Accounts .

1.1.11   "**Borrowing Base Certificate**" – a certificate, signed by an Authorized Officer, which provides the most recently available information with respect to the Eligible Accounts of Borrower (segregated by the classes (if any)) that is set forth in the books and records of Borrower, in form and substance satisfactory to the Lender.

1.1.12   "**Business Associate Agreement**" – The certain Business Associate Agreement dated as of essentially even date herewith by and between Lender and Borrower.

1.1.13   "**Business Day**" – A day on which a bank is open for business in the Chosen State.

1.1.14   "**Chosen State**" – California.

1.1.15   "**Collateral**" – All Borrower's present and future Accounts (including IGT Accounts), Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, and the proceeds thereof.

1.1.16   "**Commercial Lock Box**" –A lock box relationship between Borrower and Borrower's Bank.

1.1.17   "**Complete Termination**" – Complete Termination occurs upon satisfaction of the following conditions:

(a)      Payment in full of all Obligations;

(b)      If Lender has issued or caused to be issued guarantees, commitments to third parties or letters of credit on behalf of Borrower, acknowledgement from any beneficiaries thereof that Lender or any other issuer has no outstanding direct or contingent liability therein.

(c)     Each Borrower has executed and delivered to Lender a general release in the form of Exhibit 1.1.17(c) attached hereto.

1.1.18 "**Contractual Termination Date**" – The Maturity Date.

1.1.19 "**Default Interest Rate Spread**" – 11%.

1.1.20 "**Default Waiver Fee**" – $1,000.

1.1.21 "**Deposit Account Control Agreement**" – With respect to each Borrower, that certain agreement among Borrower, Lender and Borrower's Bank, in a form and substance acceptable to Lender, providing, among other things, that (i) Lender has control of the Bank Account (within the meaning of Section 9-104 of the UCC), and (ii) Borrower's Bank agrees to sweep on a daily basis or as frequently as Lender otherwise designates, all funds in the Bank Account to a bank account of Lender identified therein.

1.1.22 "**DHCS**" – The California Department of Health Care Services.

1.1.23 "**DHCS Agreement**" – That certain Intergovernmental Agreement Regarding Transfer of Public Funds, dated as of August 1, 2025, between DHCS and Borrower.

1.1.24 "**DHCS Invoice**" - Invoice # [___] issued by DHCS to Borrower arising from the DHCS Agreement.

1.1.25 "**Eligible Account**" – An Account, excluding the following:

(a)     Any Account to the extent it remains uncollected for more than Permitted Days from Invoice date (each a "Delinquent Account");

(b)     Any Account due from an Account Debtor that is insolvent;

(c)     Any Account due from an Account Debtor affiliated with Borrower in any manner;

(d)     Any Account which is not unconditionally due and owing; such as (but not limited to) a consignment transaction;

(e)     Accounts commonly known as "bill and hold" or a similar arrangement;

(f)     Any Account owing by an Account Debtor which does not have a place of business in the United States or which is not payable in U.S. dollars, other than an Account (i) covered by credit insurance in form and amount, and by an insurer, satisfactory to Lender, or (ii) supported by a letter of credit issued by a financial institution acceptable to Lender;

(g)      Any Account due from an Account Debtor who is any national, federal state or municipal government, including, without limitation, any instrumentality, division, agency, body or department thereof, except where the Account Debtor is instructed to make payment to the Governmental Lock Box;

(h)      Accounts due from an Account Debtor as to which 25% percent or more of the aggregate dollar amount of all outstanding Accounts owing from such Account Debtor are Delinquent Accounts;

(i)      That portion of Accounts due from an Account Debtor which is in excess of 40% percent of Borrower's aggregate dollar amount of all outstanding Accounts

(j)      Accounts which are not free of all liens, encumbrances, charges, rights and interest of any kind, except in favor of Lender;

(k)      Accounts which are supported or represented by a promissory note, post-dated check or letter of credit unless Lender holds a first perfected security interest therein;

(l)      Except as otherwise accepted by Lender, Accounts that represent progress payments or other advance billings that are due prior to the completion of performance by Borrower of the subject contract for goods or services;

(m)      Accounts which are billed directly to patients treated on the Borrower's premises

(n)      Accounts for which Borrower is or may become indebted to the Account Debtor; and

(o)      Accounts that are unsuitable as collateral, as determined by Lender in the exercise of its sole discretion.

1.1.26  "**EOB**" – The explanation of benefit or remittance advice from a Payor that identifies the services rendered on account of the Account specified therein.

1.1.27  "**Estimated Collectable Value**" – The amount which Lender estimates is collectable on an Eligible Account, as determined by Lender in its Permitted Discretion.

1.1.28  "**Event of Default**" – See Section 12 hereof.

1.1.29  "**Expense Deposit**" – $45,000.

1.1.30  "**Exposed Payments**" – Payments received by Lender from an Account Debtor that has become subject to a bankruptcy proceeding, to the extent such payments cleared said Account Debtor's deposit account within ninety days of the commencement of said bankruptcy case.

BN 28842816v12
106756955v2

1.1.31 "**GAAP**" – Generally accepted accounting principles.

1.1.32 "**Governmental Accounts**" – Accounts for which the Payor is the United States of America or any state or any agency or instrumentality thereof or any state which is obligated to make any payments with respect to Medicare or Medicaid Accounts or representing amounts owing under any other program established by federal or state law which provides for payments for healthcare goods or services to be made to Borrower.

1.1.33 "**Governmental Entity**" means the United States of America, any state thereof, any political subdivision of a state thereof and any agency or instrumentality of the United States of America or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.1.34 "**Governmental Lock Box**" – A lock box relationship between Borrower and a Governmental Lock Box Bank.

1.1.35 "**Governmental Lock Box Bank**" – A financial institution acceptable to Lender which has entered into a Lock Box Agreement.

1.1.36 "**Guarantors**" – All individuals and entities now or hereafter guaranteeing the Obligations.

1.1.37 "**IGT**" – Intergovernmental transfer.

1.1.38 "**IGT Account**" – Medi-Cal Managed Care Rate Range IGT payments owing by participating IGT Health Plans.

1.1.39 "**IGT Health Plans**" - Kaiser Foundation Health Plan, Inc., Molina Healthcare of California, and Inland Empire Health Plan.

1.1.40 "**Insurer**" means any Person (other than a Governmental Entity) which in the ordinary course of its business or activities agrees to pay for healthcare goods and services received by individuals, including commercial insurance companies, nonprofit insurance companies (such as the Blue Cross, Blue Shield entities), employers or unions which self insure for employee or member health insurance, prepaid health care organizations, preferred provider organizations, health maintenance organizations, commercial hospitals, physicians groups or any other similar Person. "**Insurer**" includes insurance companies issuing health, personal injury, workers' compensation or other types of insurance but does not include any individual guarantor.

1.1.41 "**Interest Rate**" – 2.5% for each 30 day period.

1.1.42 "**Invoice**" – The document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

5 of 34

EXHIBIT 1, PAGE 21

1.1.43 "**Loan Balance**" – The unpaid balance of all cash obligations under the Loan Documents.

1.1.44 "**Loan Documents**" – this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.1.45 "**Lock Box Agreement**" An agreement among Borrower, Lender and the Governmental Lock Box Bank wherein (i) the Governmental Lock Box Bank agrees to sweep all deposits to the Deposit Account associated with the Governmental Lock Box (whether or not represented by collected funds) into a deposit account identified in said Agreement which is owned by Lender, (ii) the Borrower is permitted to revoke such sweep instructions upon written instructions from Borrower to the Governmental Lock Box Bank predicated on Borrower notifying Lender of Borrower's intent to revoke said instructions no later than two weeks prior to sending instructions to Governmental Lock Box Bank and (iii) the Governmental Lock Box Bank agrees to immediately notify Lender in writing upon receipt of such instructions.

1.1.46 "**Maturity Date**" – December [   ], 2026.

1.1.47 "**Maximum Amount**" – $4,000,000.

1.1.48 "**Misdirected Payment Fee**" –

(a)    15% of the amount of any payment (but in no event less than $1,000) on account of an IGT Account which has been received by Borrower or a third party and not paid by Borrower to Lender or the Bank Account, as the case may be, on the next Business Day following the date of receipt by Borrower or the date of Borrower's knowledge of receipt by such third party, or

(b)    30% of the amount of any such payment which has been received by Borrower (other than payment to the Bank Account) or any third party as a result of any action taken by Borrower to cause such payment to be made to Borrower (other than payment to the Bank Account) or any third party.

1.1.49 "**Notice**" means a notice letter on the Borrower's corporate letterhead to a Payor, in a form acceptable to Lender in its sole discretion.

1.1.50 "**Obligor**" – the Borrower or any Guarantor.

1.1.51 "**Obligations**" – all present and future obligations owing by Borrower to Lender whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any case filed under any federal or state debtor relief statute in which Borrower is a debtor.

1.1.52 "**Origination Fee**" – 2.0% of the Maximum Amount.

6 of 34

1.1.53 "**Other Taxes**" – See Section 3.3.2.

1.1.54 "**Parties**" – Borrower and Lender.

1.1.55 "**Payor**" – An Account Debtor or other obligor on an Account, or entity making payment thereon for the account of such party.

1.1.56 "**Permitted Days**" – 90 days.

1.1.57 "**Permitted Discretion**" – A determination made in good faith and in the exercise of what the Lender believes is reasonable business judgment.

1.1.58 "**Person**" – Any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

1.1.59 "**Sanctions**" – See Section 7.14.

1.1.60 "**Taxes**" – See Section 3.3.1.

1.1.61 "**Termination Date**" – the earlier of (i) the Contractual Termination Date, (ii) the effective date of termination as set by Lender pursuant to the terms hereof, or (iii) the date that Borrower terminates this Agreement and pays the Obligations to Lender in full.

1.1.62 "**Third Party Claim**" – claims asserted against Lender by any Person or entity relating in any way to the Lender's relationship with Borrower.

1.1.63 "**UCC**" – The Uniform Commercial Code in effect in the Chosen State at the date on which a determination thereunder is to be made.

2.   Credit Facilities.

2.1   Advances. Subject to the terms and conditions of this Agreement, from the date on which this Agreement becomes effective until the Termination Date:

2.1.1   Lender, may, from time to time in its sole discretion, at the request of Borrower, make advances ("**Advances**") to Borrower.

2.1.2   Lender does not intend to make Advances if, before or after such Advance, the Loan Balance exceeds the Allowable Amount

2.1.3   The fact that the Borrower is bound to various covenants herein, the breach of which may allow Lender to accelerate the due date of Borrower's Obligations hereunder, shall not be construed to constitute a commitment by Lender to make any Advances hereunder, all of which are in the Permitted Discretion of Lender.

BN 28842816v12
106756955v2

2.2     General Provisions.

2.2.1     Borrowing Base Certificate.  Each request from Borrower for an Advance hereunder shall be accompanied by a Borrowing Base Certificate, completed and signed by Borrower.

2.2.2     Crediting Borrower's Account.  All payments by Lender to Borrower hereunder may be made to any demand deposit account of Borrower.

2.2.3     Authorization for Advances.  Subject to the terms and conditions of this Agreement, Lender is authorized to make payments to Borrower hereunder:

(a)     Upon any other instructions received from anyone purporting to be an officer, employee or representative of Borrower; or

(b)     At the Permitted Discretion of Lender, and notwithstanding any other provision in this Agreement, if necessary to meet any Obligations, including but not limited to any interest not paid when due.

3.     Payments by Borrower.

3.1     In General.

3.1.1     Place of Payments.  Borrower shall make all payments to Lender at Lender's address set forth herein or at such other place as Lender may designate in writing.

3.1.2     Automated Clearing House Debits.  In order to satisfy any of the Obligations, Lender is hereby authorized by Borrower to initiate electronic debit entries through the Automated Clearing House or other electronic payment system to any account maintained by Borrower.  At the Lender's request, Borrower shall execute and deliver to Lender an authorization agreement for Automated Clearing House debits.

3.1.3     Borrower and Lender agree that the order and method of application of payments against the then due and payable Obligations shall be as follows:

(a)     first, to unpaid fees and expenses owing to Lender hereunder;

(b)     second, to accrued and unpaid interest, and

(c)     third, to the unpaid principal balance and any other Obligations owing hereunder.

BN 28842816v12
106756955v2

EXHIBIT 1, PAGE 24

3.2      Interest and Fees, and Expense Deposit.

       3.2.1      Interest.

       (a)      Subject to Section 3.2.1(b) hereof, interest on the Loan Balance shall be payable monthly, in arrears, shall be computed at the Interest Rate, and shall be due on the first day of each month following the accrual thereof.

       (b)      Immediately upon the occurrence of an Event of Default, the Interest Rate shall be increased by the Default Interest Rate Spread.

       (c)      All interest charged hereunder shall be computed on the basis of a 360 day year for the actual number of days elapsed.

       3.2.2      Notwithstanding anything to the contrary contained in any Loan Document, the interest paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**") unless exempted due to Lender's California Finance Lenders Law license.  If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the loans hereunder or, if it exceeds such unpaid principal, refunded to Borrower.  In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

       3.2.3      Fees.

       (a)      Origination Fee.  Borrower shall pay the Origination Fee on the date hereof out of the initial Advance hereunder.

       (b)      Default Waiver Fee.  Borrower shall pay the Default Waiver Fee to Lender, immediately upon the waiver by Lender of any Event of Default hereunder, so long as the waiver was done at the Borrower's request.

       (c)      Standard Fees.  Borrower shall pay to Lender fees for such services as Lender customarily charges.  Lender shall have the right to change all or any of such fees upon 10 days' notice to Borrower.

       (d)      Misdirected Payment Fee.  Any Misdirected Payment Fee immediately upon its accrual.  It is recognized that the costs imposed upon Lender by the Borrower's action or inaction resulting in the imposition of this fee are difficult to ascertain, and this fee represents the good faith effort to compensate Lender without imposing upon the parties the expensive burden of litigating that cost, and is the agreed liquidated damages that will result therefrom.

BN 28842816v12
106756955v2

3.2.4    Expense Deposit.

(a)    Borrower has paid to Lender, on or prior to the date hereof, the non-refundable Expense Deposit to reimburse Lender for its actual expenses incurred in connection with the origination, review and approval process, along with attorneys' fees and other expenses incurred in the documentation of this Agreement (the "**Approval Process Expenses**").

(b)    Lender shall provide a written accounting of all Approval Process Expenses (which accounting shall be conclusive absent manifest error) to Borrower.

(c)    To the extent that the Approval Process Expenses are less than the amount of the Expense Deposit (an "**Expense Deposit Surplus**"), the Expense Deposit Surplus shall be returned to Borrower on demand.

(d)    To the extent that the Approval Process Expenses are greater than the amount of the Expense Deposit (an "**Expense Deposit Shortfall**", the Expense Deposit Shortfall shall be payable by Borrower on demand or from Advances hereunder, unless this transaction does not close as the direct result of Lender's gross negligence or willful misconduct.

3.3    Taxes.

3.3.1    Each payment hereunder and under the other Loan Documents shall be made no later than 3:00 PM (New York City time) on the day when due in lawful money of the United States of America without counterclaim, defense, offset, claim or recoupment of any kind and free and clear of, and without deduction for, any present or future withholding or other taxes, duties, levies, imposts, deductions, charges or other liabilities of any nature imposed on such payments or prepayments by or on behalf of any Governmental Entity, except for taxes upon or determined by reference to the Lender's net income imposed by the jurisdiction in which the Lender is organized or has its principal or registered lending office (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities hereinafter referred to as "**Taxes**").  If any such Taxes are so levied or imposed on any payment to the Lender, the Borrower will make additional payments in such amounts as may be necessary so that the net amount received by the Lender, after withholding or deduction for or on account of all Taxes, including deductions applicable to additional sums payable under this Section 3.3, will be equal to the amount provided for herein or in the other Loan Documents.  Whenever any Taxes are payable by Borrower with respect to any payments hereunder, the Borrower shall furnish promptly to the Lender information, including certified copies of official receipts (to the extent that the relevant governmental authority delivers such receipts), evidencing payment of any such Taxes so withheld or deducted.  If Borrower fails to pay any such Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required information evidencing payment of any such Taxes so withheld or deducted, the Borrower shall jointly and severally indemnify the Lender for any incremental Taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

3.3.2    Notwithstanding anything to the contrary contained in this Agreement, the Borrower shall pay any present or future stamp or documentary taxes, any

intangibles tax or any other sales, excise or property taxes, charges or similar levies now or hereafter assessed that arise from and are attributable to any payment made hereunder or from the execution, delivery or performance of, or otherwise with respect to, this Agreement or any other Loan Documents and any and all recording fees relating to any Loan Documents securing the Obligations ("**Other Taxes**").

       3.3.3   The Borrower shall indemnify the Lender for the full amount of any and all Taxes and Other Taxes (including, without limitation, any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 3.3 paid or payable by the Lender (whether or not such Taxes or Other Taxes were correctly or legally asserted) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. Indemnification payments due to the Lender under this Section 3.3 shall be made within 10 Business Days from the date the Lender makes written demand therefor.

   4.   <u>Indemnification Protection</u>.

       4.1   Notwithstanding payment in full of the Obligations and termination of this Agreement, in the event that (i) a Third Party Claim has been asserted against Lender, or (ii) Lender believes in good faith that a Third Party Claim may be asserted against Lender, Lender may retain its security interest or any funds of Borrower in the amount of the Third Party Claim together with Lender's good faith estimate of its costs to be incurred in the defense thereof, until such time as the Third Party Claim is withdrawn or satisfied, unless Lender receives Assurances regarding its exposure to the Third Party Claim.

   5.   <u>Grant of Security Interest</u>.

       5.1   To secure the performance of the Obligations, Borrower grants to the Lender a security interest in the Collateral, and all proceeds and products thereof.

   6.   <u>Authorization to File Financing Statements</u>.

       6.1   Borrower, expressly conditioned on approval by the Bankruptcy Court, irrevocably authorizes the Lender to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that:

       6.1.1   Indicate the Collateral as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

       6.1.2   Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization, and any organization identification number issued to the Borrower and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral to be as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates;

11 of 34

6.1.3    Contain a notification that the Borrower has granted a negative pledge to the Lender, and that any subsequent lienor may be tortuously interfering with Lender's rights;

6.1.4    Advises third parties that any notification of Borrower's Account Debtors will interfere with Lender's collection rights;

6.2    Borrower ratifies its authorization for the Lender to have filed any like initial financing statements or amendments thereto if filed prior to the date hereof; and

6.3    The Lender may add any supplemental language to any such financing statement as Lender may determine to be necessary or helpful in acquiring or preserving rights against third parties.

7.    <u>Representations and Warranties by Borrower</u>.

7.1    Borrower is fully authorized to enter into this Agreement and to perform hereunder.

7.2    This Agreement constitutes Borrower's legal, valid and binding obligation.

7.3    Borrower has good title to, has rights in, and the power to transfer each item of Collateral upon which it purports to grant a lien hereunder, free and clear of all liens.

7.4    All Accounts (including but not limited to the IGT Accounts) listed on any report provided by Borrower to Lender will be:

7.4.1    Bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Borrower's business;

7.4.2    Unconditionally owed and will be paid without the assertion of any claim; and

7.4.3    Not sales to any entity that is affiliated with Borrower or in any way not an "arm's length" transaction.

7.5    All financial statements relating to Borrower that have been delivered by Borrower to Lender have been prepared in accordance with GAAP and fairly present Borrower's financial condition as of the date thereof and Borrower's results of operations for the period then ended.  There has not been a material adverse change in the financial condition of Borrower since the date of the latest financial statements submitted to Lender on or before the date hereof.

7.6    Borrower agrees to maintain books and records and its records pertaining to the Collateral in accordance with GAAP and in such additional detail, form and scope, as Lender shall reasonably require.

7.7    Borrower has all permits, licenses, provider numbers and agreements, accreditations, certifications, authorizations, approvals, consents and agreements of all Payors,

governmental agencies and instrumentalities, accreditation agencies and any other Person necessary or required for Borrower to own the assets that it now owns, to carry on its business as now conducted, to execute, deliver and perform this Agreement, including any other documents contemplated hereby, and to receive payments from Payors.

7.8     Borrower has not been notified by any such Payor, governmental agency or instrumentality, accreditation agency or any other Person that any such Payor, agency, instrumentality or other Person has rescinded or not renewed, or intends to rescind or not renew, any such permit, license, provider number or agreement, accreditation, certification, authorization, approval, consent or agreement granted by it to Borrower or to which it and Borrower are parties.

7.9     Neither Borrower nor any Persons who provide professional services under agreements with Borrower have engaged in any activities which are prohibited under federal Medicare or Medicaid statutes, federal CHAMPUS or TRICAFE statutes or regulations promulgated pursuant to such statutes or any other federal or state or local statutes or regulations or which are prohibited by rules of professional conduct, including:

7.9.1     Knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment;

7.9.2     Knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment;

7.9.3     Failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another;

7.9.4     Knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration:

(a)     In return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program or other governmental healthcare program;

(b)     In return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program or other governmental healthcare program; or

(c)     In connection with making prohibited referrals.

7.10     Borrower created its Accounts in the ordinary course of its business and were medically necessary or appropriate.

BN 28842816v12
106756955v2

7.11    The fees charged for the goods or services rendered giving rise to each Account were:

7.11.1 The usual, customary and reasonable fees charged by other providers in the Borrower's community and the community in which such patient resides for the same or similar goods and services; and

7.11.2 If such fees were subject to limitations imposed by workers' compensation regulations or by contracts for reimbursement from Payors, not in excess of the limitations so imposed and each Account relating to goods and services the fees for which are so restricted has been clearly identified by the Borrower to Lender as being subject to such restriction.

7.12    If required by law, each patient signed any required consent sufficient to allow Borrower to deliver to Lender and for Borrower and Lender to deliver to any Payor information necessary for the performance of servicing obligations regarding the Accounts without violating any patient's privacy rights.

7.13    Any insurance policy, contract or other instrument obligating a Payor to make payment with respect to any Account:

7.13.1 Does not contain any provision prohibiting the transfer of the right to receive such payment from the patient to Borrower, or from Borrower to Lender, except in the case of Governmental Accounts;

7.13.2 Has been duly authorized and, together with the Account, constitutes the legal, valid and binding obligation of the Payor enforceable against such Payor in accordance with its terms;

7.13.3 Together with the Account, does not contravene in any material respect any requirement of law applicable thereto;

7.13.4 Was in full force and effect and applicable to the patient at the time the goods or services constituting the basis for the Account were furnished.

7.14    None of the Borrower, any of its subsidiaries, any director or officer, or any employee, agent, or affiliate, of the Borrower or any of its subsidiaries is a Person that is, or is owned or controlled by Persons that are, (i) the subject of any sanctions administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control, the US Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, the Hong Kong Monetary Authority or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, without limitation, currently, Cuba, the Crimea region of Ukraine, Iran, North Korea, Sudan and Syria.

7.15    None of the Borrower or any of its subsidiaries, nor to the knowledge of the Borrower, any director, officer, agent, employee, affiliate or other Person acting on behalf of the Borrower or any of its subsidiaries is aware of or has taken any action, directly or indirectly, that

14 of 34

would result in a violation by such Persons of any applicable anti-bribery law, including but not limited to, the United Kingdom Bribery Act 2010 (the "**UK Bribery Act**") and the U.S. Foreign Corrupt Practices Act of 1977 (the "**FCPA**"). Furthermore, the Borrower and, to the knowledge of the Borrower, its affiliates have conducted their businesses in compliance with the UK Bribery Act, the FCPA and similar laws, rules or regulations and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

7.16    Borrower is currently a debtor in a Chapter 9 municipal bankruptcy case pending in the United States Bankruptcy Court for the Central District of California, Riverside Division, Case No. 6:25-bk-17084-SY. Borrower is subject to applicable provisions of the Title 11 of the United States Code (i.e., the Bankruptcy Code) and the jurisdiction of the Bankruptcy Court to the extent provided in 11 U.S.C. § 904.

7.17.  Borrower has informed Lender that it has been granted a one-time extension to December 11, 2025 to make payments to the DHCS on the DHCS Invoice to enable borrower to receive payment on the IGT Accounts, and that this is a deadline not subject to further extension. If the Advances, in an amount no less than $3,450,000, are not received prior to December 10, 2025, Borrower represents and warrants to Lender that it will not be able to make the prerequisite payments to receive the IGT Accounts.

7.18    Borrower has the power and authority to own its own assets and to transact the business in which it is engaged, and is properly licensed, qualified to do business and in good standing in all necessary jurisdictions.

8.    Collection and Administration of Accounts.

8.1    Direction of Payments.

8.1.1    Borrower shall cause the IGT Health Plans to pay all present and future IGT Accounts to the Bank Account.

8.1.2    Upon Lender's demand, Borrower shall prepare, execute and deliver to (or, in the case of Notice to an Insurer, provide to the Lender for delivery to) each Payor (or, in the case of a Governmental Entity, its fiscal intermediary), with copies to the Lender, on or prior to the date of each Advance, a Notice, which Notice shall with respect to Insurers, state that all present and future Accounts owing to Borrower are subject to the lien of the Lender and that in the case of any Notice to an Insurer, all checks and EOBs from such Insurer on account of Accounts shall be sent to the applicable Commercial Lock Box and all wire transfers from such Insurer on account of the Accounts shall be wired directly into the applicable Bank Account.

8.1.3    Borrower covenants and agrees that, after Lender's demand, all Invoices (and, if provided by Borrower, return envelopes) sent to Payors shall set forth in the case of Insurers, only the address of the applicable Commercial Lock Box as a return address for payment of Accounts by check and delivery of EOBs, and the Bank Account with respect to wire transfers for payment of Accounts.  Borrower hereby further covenants and

agrees to instruct and notify each of the members of its accounting and collections staff to provide identical information in communications with Payors with respect to the payment of Accounts, wire transfers and EOBs.

8.1.4    Upon Lender's demand, Borrower shall send Notices to Payors who owed Governmental Accounts to send the proceeds of Governmental Accounts to the applicable Governmental Lock Box.

8.1.5    Borrower authorizes Lender to prepare and send the Notices described in this Section 8.1. to any or all of Borrower's customers in Borrower's name, and to provide Lender all such information as Lender requests in order to prepare such Notices.

8.2    Receipt of Funds by Borrower.  In the event Borrower receives proceeds of Collateral (including but not limited to an proceeds of IGT Accounts) in the form of a wire transfer or other intangible funds transfer mechanism, other than direct deposits into the applicable Bank Account, the applicable Commercial Lock Box, or the applicable Governmental Lock Box, as applicable, Borrower shall immediately pay such proceeds to Lender.  Upon Borrower's receipt of proceeds of IGT Accounts, Borrower shall not transfer any funds from any Deposit Accounts of Borrower until 100% of such proceeds are paid to Lender.

8.3    Lender's Powers.  Borrower hereby authorizes Lender, at Borrower's sole expense, to exercise at any time in Lender's Permitted Discretion all or any of the following powers, which powers are irrevocable until all of the Obligations have been paid in full:

8.3.1    Receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof;

8.3.2    Pay any sums necessary to discharge any lien or encumbrance that is senior to Lender's security interest in the Collateral, which sums shall be included as Obligations hereunder.

8.3.3    Send requests (which may identify the sender by a pseudonym) for verification of any Accounts directly to the Account Debtor or any bailee of the Collateral.

8.4    Release.  Borrower hereby releases and exculpates Lender, its officers, employees, agents, designees, attorneys, and accountants from any liability arising from any acts under this Agreement or in furtherance thereof, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct.  In no event shall Lender have any liability to Borrower for lost profits or other special or consequential damages.

9.    Authorization to Lender.

9.1    Borrower irrevocably authorizes Lender to take any and all appropriate action and to execute any and all documents and instruments, in the name of Borrower, that may

BN 28842816v12
106756955v2

be necessary or desirable to protect Lender's interest in the Collateral, including the filing on behalf of Borrower with such governmental authorities as are appropriate such documents (including, without limitation, applications, certificates, and tax returns) as may be required for purposes of having Borrower qualified to transact business in a particular state or geographic location.

10.    Affirmative Covenants.

10.1    Until full payment of the Obligations and termination of this Agreement, Borrower shall:

10.1.1 Furnish to Lender, in form and substance satisfactory to Lender:

(a)    Tax Returns.  Copies of each of Borrower's:

(i)    Federal payroll tax returns within 10 days of filing, together with proof, satisfactory to Lender, that Borrower has paid all taxes.

(b)    Aging – A detailed listing of Borrower's unpaid Accounts, in such form as is acceptable to Lender, every month and whenever requested by Lender, certified by Borrower's chief financial officer as being complete and correct.

(c)    Financial Reports.  As soon as available but not later than 30 days after the last day of each month, a Borrower prepared balance sheet and income statement covering Borrower's operations for such month certified by the chief financial officer and such other information as Lender shall reasonably request.

10.1.2 Inspections.

(a)    During usual business hours, permit Lender, without notice to Borrower, to periodically:

(i)    Have access to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, and

(ii)    To inspect, audit, make copies of, and make extracts from Borrower's records as Lender may request.

(b)    Without expense to Lender, Lender may use any of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Lender, in its Permitted Discretion, deems appropriate.

10.1.3 Indemnify and save Lender harmless from any and all liability with respect to any Third Party Claim, including the costs incurred in the defense thereof, provided, however, that such indemnity shall not extend to liability and costs incurred as a

BN 28842816v12
106756955v2

result of gross negligence, bad faith, or willful misconduct of Lender or Lender's affiliates, officers, directors, employees, agents or advisors.

10.1.4 Reimburse Lender for all costs and expenses, including attorneys' fees, which Lender incurs in enforcing any judgment rendered in connection with this Agreement. This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

10.1.5 <u>Taxes and Expenses Regarding Borrower's Assets</u>.

(a)     Make timely payment when due without extension of all taxes, assessments or contributions required of Borrower. If Borrower fails to make any such payment or deposit or furnish proof of such payment immediately upon Lender's request, Lender may in its Permitted Discretion and without notice to Borrower:

(i)     Make payment of the same or any part thereof; or

(ii)     Set up such reserves against the Obligations as Lender deems necessary to satisfy the liability therefore.

(b)     Lender may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency. Any payment made by Lender shall constitute neither:

(i)     An agreement by Lender to make similar payments in the future; nor

(ii)     A waiver by Lender of any default under the Loan Documents. Lender need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

10.1.6 Give Lender written notice immediately upon forming an intention to change its name, state of organization or form of business organization.

10.1.7 <u>Maintenance of Insurance</u>.

(a)     The Borrower will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.

(b)     Such insurance shall be in such minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender.

(c)  All such insurance shall be payable to the Lender under a Lender Loss Payable Endorsement.  Without limiting the foregoing, the Borrower will:

(i)  Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

(ii)  Maintain all such workers' compensation or similar insurance as may be required by law;

(iii)  Maintain, in amounts (except as explicitly provided below) and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; product liability insurance; and directors and officers liability insurance in a minimum amount of $1,000,000; and

(iv)  Provide Lender with proof of such coverage naming Lender under a Lenders Loss Payable Endorsement.

(d)  In the event that Borrower fails to maintain such insurance, Lender may obtain such insurance at Borrower's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance.

10.1.8 Borrower hereby permits Lender at any time to access electronically information concerning any accounts maintained by Borrower with any bank or other financial institution so long as such access is in furtherance of, or to monitor compliance with, the terms of this Agreement, and Borrower shall provide Lender with all necessary access codes, passwords and the like to carry out the provisions hereof.

10.2  Upon Lender's demand, before sending any Invoice to any Payor, Borrower shall instruct that all payments on account thereof be made directly to:

10.2.1 The applicable Bank Account or, if the Lender elects, to Lender, if the Account is not the result of healthcare services provided pursuant to a program of the United States Government which requires that payments thereunder be made only to the Governmental Lock Box, by sending a Notice to the applicable Payor, or in all other cases,

10.2.2 The applicable Governmental Lock Box, by sending the form notice to Payors of Governmental Accounts attached hereto as Exhibit 10.2.2, the Department of Health and Human Services Center for Medicare & Medicaid Services Form CMS-588, or such other form as shall be selected by Lender.

10.3    Borrower shall pay to Lender, on demand, all attorneys' fees and expenses directly or indirectly incurred by Lender in the drafting, negotiation or administration of this Agreement or any documents related hereto.  Borrower hereby directs Lender to (i) withhold $100,000 out of the initial Advance hereunder (the "**Attorneys' Fee Reserve**"), and (ii) apply the Attorneys' Fee Reserve to any attorneys' fees incurred by Lender after the date hereof in connection with the administration or enforcement of this Agreement.

10.4    Borrower shall pay to Lender, on demand, any amount by which the Loan Balance exceeds the Allowable Amount.

10.5    Notwithstanding Borrower's obligation to pay the Misdirected Payment Fee, Borrower shall pay to Lender, on the next banking day following the date of receipt by Borrower, the amount of any payment on account of an Account.

10.6    On or before the date hereof, Borrower will cause Borrower's Bank to enter into the Deposit Account Control Agreement with Borrower and Lender.

10.7    Borrower shall ensure that Lender at all times has a list of all of Borrower's deposit accounts.

10.8    Promptly upon request by Lender, Borrower will cause the Governmental Lock Box Bank to enter into the Lock Box Agreement with Borrower and Lender.

10.9    Within 30 days of Lender's demand, Borrower shall deliver to Lender deposit account control agreements covering all deposit account maintained by Borrower, duly executed by the Borrower and the depository institutions where such deposit accounts are maintained, which deposit account control agreements shall be in form and content satisfactory to Lender in its Permitted Discretion.

10.10    Borrower shall ensure that Lender at all times has:

10.10.1 a list of all Borrower's Account Debtors and their addresses.

10.10.2 all information necessary to complete Notices and to change payment instructions with respect to Accounts.

10.11    Borrower may not create, incur, assume or permit to exist any lien upon or with respect to any assets in which Lender now or hereafter holds a security interest without the prior written consent of Lender, which consent will not be unreasonably withheld so long as the subordinate secured party and Lender enter into a consent agreement acceptable to Lender.

10.12    Servicing of Accounts.

10.12.1Borrower shall administer and service the Accounts (i) in compliance at all times with all legal requirements and the terms and conditions of this Agreement, (ii) in accordance with industry standards for servicing Accounts of the type included in the Collateral to the extent that such standards do not conflict with the terms and conditions of this Agreement, (iii) in a manner consistent in all respects with Borrower's

billing and collection policy provided to the Lender, and (iv) until such time as a successor servicer shall be designated and shall accept appointment pursuant to this Section.  Borrower shall establish and maintain electronic data processing services for monitoring, administering and collecting the Accounts in accordance with the foregoing standards and shall, within three Business Days of the deposit of any checks, other forms of cash deposits, EOBs or other written matter into the applicable Commercial Lock Box or applicable Governmental Lock Box, as applicable, post such information to its electronic data processing services.

10.12.2 Borrower may not change in any material respect its existing policies and procedures with respect to the administration and servicing of Accounts (including, without limitation, the amount and timing of write-offs) without the prior written consent of the Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

10.12.3 If Borrower determines that a payment with respect to an Account has been received directly by a patient or any other Person, Borrower shall promptly advise the Lender, and demand that such patient or other Person remit and return such funds. If such funds are not promptly received by Borrower, Borrower shall take all commercially reasonable steps to obtain such funds.

10.12.4 Upon the occurrence of an Event of Default: (i) the Lender may terminate Borrower's performance of servicing responsibilities with respect to the Accounts and appoint another Person to succeed Borrower in the performance of such servicing responsibilities (which replacement may be effectuated through the outplacement to a third-party collection firm obligated to use commercially reasonable efforts to maximize collections in accordance with the provisions of Article 9 of the UCC), in which event Borrower shall immediately transfer to any successor servicer designated by the Lender all records, computer access and other information as shall be necessary or desirable, in the judgment of any such successor servicer, to perform such responsibilities; and (ii) at the Lender's request, all enforcement and collection proceedings with respect to the Accounts shall, unless prohibited by applicable law, be instituted and prosecuted in the name of the Lender.  Borrower shall otherwise cooperate fully with such successor servicer.

10.13   Borrower shall preserve all of licenses, permits, governmental approvals, rights, privileges and franchises required for the conduct of its business, and will promptly advise Lender of any circumstances that Borrower believes or should reasonably believe could cause the impairment thereof.

10.14   In the event that DHCS rejects the payment from Borrower on the DHCS Invoice, Borrower shall cause DHCS to repay such payment in full to Borrower and/or Lender within [__] days of such rejection.

11.    Negative Covenants.  Borrower will not:

11.1   Modify Account Obligations.  After an Event of Default, (i) grant any extension of time for payment of any Accounts, (ii) compromise or settle any Accounts for less than the full amount thereof, (iii) release in whole or in part any Account Debtor; or (iv) grant any

credits, discounts, allowances, deductions, return authorizations, or the like with respect to any Accounts.

       11.2   <u>Negative Pledge</u>.  Hereafter grant any lien upon the Collateral except in favor of Lender.

       11.3   <u>Mergers, etc.</u>  Enter into any acquisition, merger, consolidation, reorganization, or recapitalization, or reclassify its capital stock, or liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, assign, lease, transfer, or otherwise dispose of, in a single transaction or a series of transactions, all or any substantial part of its business, property, or assets, whether now owned or hereafter acquired, or acquire by purchase or otherwise all or substantially all of the properties, assets, stock, or other evidence of beneficial ownership of any entity.  To the extent any such transaction is contemplated, Borrower may request written authorization from Lender to dispose of assets, including any portion of the Collateral.

       11.4   <u>Transfer of Assets</u>.  Enter into any transaction not in the ordinary and usual course of Borrower's business, including the sale, lease, or other disposition of, moving, relocation, or transfer, whether by sale or otherwise, of any of Borrower's properties, assets (other than sales of Inventory to buyers in the ordinary course of Borrower's business as currently conducted).

       11.5   <u>Suspension of Business</u>.  Suspend or go out of a substantial portion of its business.

       11.6   <u>Change in Business</u>.  Engage in any business other than the business currently engaged in by Borrower, or reasonably related thereto.

       11.7   <u>Debt</u>.  Incur debt or contingent obligations, other than debt incurred hereunder, or guaranty the debt of any other entity or individual.

       11.8   <u>Transactions with Affiliates</u>.  Directly or indirectly enter into or permit to exist any material transaction with any affiliate of Borrower, except for transaction that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated entity or individual.

       11.9   <u>Use of Proceeds</u>.

       11.9.1  Use any proceeds of Advances for any purpose other than to pay in full to DHCS the amount due under the DHCS Invoice, and any proceeds of Advances remaining after such payment may be used for ordinary operating expenses and or payment of interest and other Obligations owing hereunder;

BN 28842816v12
106756955v2

11.9.2 Directly or indirectly, use the proceeds of the Advances, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(a)    To fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions;

(b)    In any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Advances, whether as underwriter, advisor, investor or otherwise), or

(c)    To be used, directly or indirectly, for any payments that could constitute a violation of any applicable anti-bribery law.

11.10    <u>Change in Payment Instructions</u>.  Borrower shall not terminate, or suffer or permit the termination of, any Commercial Lock Boxes, the Bank Accounts, any Governmental Lock Boxes, or make any change or replacement (i) in the instructions contained in any Notice or otherwise, (ii) regarding payments with respect to Accounts to be made to the applicable Commercial Lock Box, the applicable Bank Account, or the applicable Governmental Lock Box, or (iii) regarding payments to be made to the Lender, except upon the prior and express written direction of the Lender.

12.    <u>Events of Default</u>.  Each of the following events or conditions shall constitute an "**Event of Default**":

12.1    Borrower defaults in the performance of any obligation, duty, covenant or warranty hereunder or under any other agreement between it and Lender;

12.2    Any entity shall have or acquire rights in the Collateral which are superior to Lender's rights, other than as a result of Lender's intentional acts;

12.3    An order for relief is entered against any Obligor by any United States Bankruptcy Court; or any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto);

12.4    Any Obligor makes an assignment for the benefit of creditors; or any Obligor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets, or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of any Obligor;

12.5    Any Obligor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application, or otherwise) against any Obligor;

BN 28842816v12
106756955v2

12.6    Any judgment, writ, warrant of attachment, execution, or similar process shall be issued or levied against a substantial portion of the property of any Obligor;

12.7    An adverse change occurs with respect to the financial condition or operations of Borrower which results in a material impairment of the prospect of repayment of the Obligations;

12.8    Any IGT Health Plan fails to pay any IGT Accounts arising from the payment of the DHCS Invoice.

12.9    Any provision of this Agreement or any of the Loan Documents ceases, for any reason, to be valid and binding on Borrower.

13.    <u>Remedies</u>.

13.1    Upon the occurrence of any Event of Default the Loan Balance shall accrue interest at the interest rate otherwise applicable thereto plus the Default Interest Rate Spread, and Lender may:

13.1.1  Declare this Agreement terminated;

13.1.2  Declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower;

13.1.3  Take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon any Collateral;

13.1.4  Change the address for delivery of Borrower's mail to Lender and to receive and open mail addressed to Borrower;

13.1.5  Execute, file and serve, in its own name or in the name of Borrower, mechanics lien or similar notices, or claims under any payment or performance bond for the benefit of Borrower.

13.1.6  Engage a consulting, turnaround or similar firm to (a) conduct an operational assessment of Borrower, and/or (b) take day-to-day operational and administrative control of the business of the Borrower.  Borrower shall (a) bear all fees, costs and other expenses associated with such services and (b) cooperate with such firm in carrying out such services.

13.2    BORROWER WAIVES ANY REQUIREMENT THAT LENDER INFORM BORROWER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF BORROWER'S OBLIGATIONS HEREUNDER.   FURTHER, LENDER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY LENDER OF ITS CLAIM THERETO.

BN 28842816v12
106756955v2

14.    <u>Standards for Exercising Remedies</u>.  To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender:

14.1    To not incur expenses to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

14.2    To fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of;

14.3    To fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral;

14.4    To exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists;

14.5    To advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature;

14.6    To hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature;

14.7    To dispose of Collateral by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets;

14.8    To dispose of assets in wholesale rather than retail markets;

14.9    To disclaim all disposition warranties; or

14.10    To purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral.

14.11    Borrower acknowledges that the purpose of this Section 14 is to provide non-exhaustive indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 14.  Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 14.

BN 28842816v12
106756955v2

15.    Proceeds and Expenses of Dispositions.

15.1    Borrower shall pay to the Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Lender in protecting, preserving, or enforcing the Lender's rights under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as the Lender may determine, notwithstanding contrary instructions received by Lender from the Borrower or any other third party.

16.    Fees and Expenses.

16.1    Borrower agrees to reimburse Lender on demand for:

16.1.1 The actual amount of all costs and expenses including attorneys' fees which Lender has incurred or may incur in negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith;

16.1.2 The actual costs, including photocopying (which, if performed by Lender's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Borrower is a party;

19.1.3 Protecting, preserving or enforcing any lien, security interest or other right granted by Borrower to Lender or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims;

19.1.4 The actual amount of all costs and expenses, including attorneys' fees, which Lender may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Borrower, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (iii) opposing confirmation of Borrower's plan thereunder.

16.2    In the event that any Party finds it necessary to retain counsel in connection with a:

16.2.1 Contract claim relating to the interpretation, defense, or enforcement of this agreement, including fees incurred in any appellate proceedings, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party.

16.2.2 Claim other than a contract claim, then Lender shall recover its attorney's fees and expenses from Borrower, irrespective of the outcome of the dispute.

16.3    In the event that Borrower asserts a claim against Lender, it shall do so in writing prior to and as a condition of the commencement of any litigation by Borrower, setting forth the specific amount of Borrower's claim against Lender (the "**Damage Claim**"). If any

dispute resolution process results in a judgment against Lender of less than the Damage Claim, the court shall find that Lender was the prevailing party for the purposes of this Section.

16.4    It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing Party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

17.    <u>Termination</u>.

17.1    This Agreement shall become effective upon the execution hereof by Borrower and Lender and shall continue in full force and effect until Complete Termination.

17.2    Borrower shall pay to Lender the unpaid balance of the Obligations on or before the Maturity Date without demand or notice.

18.    <u>No Lien Termination without Release</u>.

18.1    In recognition of the Lender's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Borrower, Lender shall not be required to record any terminations or satisfactions of any of Lender's liens on the Collateral unless and until Complete Termination has occurred.  Borrower understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.

19.    <u>Account Stated</u>.

19.1    Lender shall render to Borrower a statement setting forth the transactions arising hereunder.  Each statement shall be considered correct and binding upon Borrower, absent manifest error, as an account stated, except to the extent that Lender receives, within 30 days after the mailing of such statement, written notice from Borrower of any specific exceptions by Borrower to that statement.

20.    <u>Retention of Records</u>.

20.1    Lender shall retain any documents, schedules, Invoices or other papers delivered by Borrower only for such period as Lender, in its Permitted Discretion, may determine necessary, after which time Lender may destroy such records without notice to or consent from Borrower.

21.    <u>Notices to Third Parties</u>.

21.1    Lender shall have the right at any time to give any Guarantor notice of any fact or event relating to this Agreement, as Lender may deem necessary or desirable in Lender's Permitted Discretion, including, without limitation, Borrower's financial condition.  Borrower shall provide to each Guarantor a copy of each notice, statement or report.

BN 28842816v12
106756955v2

22.    Information to Participants.

22.1    Lender may furnish any financial or other information concerning Borrower, or any of its subsidiaries, heretofore or hereafter provided by Borrower to Lender, pursuant to this Agreement or otherwise, to any prospective or actual purchaser of any participation or other interest in any loans made by Lender to Borrower (whether under this Agreement or otherwise), or to any prospective purchaser of any securities issued or to be issued by Lender.

23.    Protected Health Information.

23.1    The Parties acknowledge that they have executed the Business Associate Agreement providing for Lender's use and disclosure of "protected health information" and acknowledging that Lender is a "business associate" of Borrower.  The Parties agree to observe and perform the terms of the Business Associate Agreement.

24.    Entire Agreement.

24.1    No promises have been made to induce Borrower to execute this Agreement.  No course of dealing, course of performance or trade usage, and no parole evidence of any nature, may supplement or modify any terms of this Agreement.

25.    Notice.

25.1    All notices shall be effective upon:  (a) the sending of an email to one of the email addresses below or (b) delivery to a recognized overnight delivery service of a properly addressed notice, delivery prepaid, with instructions to make delivery on the next Business Day. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof.  All notices to Lender shall be effective upon actual receipt by an officer of Lender.

25.2    The addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

BORROWER

Address:        250 North 1st Street
                Blythe, CA 92225
Attention:      Sandra Anaya, Chief Executive Officer
Email:          sj.anaya@paloverdehospital.org

28 of 34

<u>LENDER</u>

Address:      1086 Teaneck Road, Suite 4D
              Teaneck, NJ 07666
Attention:    Leon Chernyavsky
Email:        leonc@alleoncapital.com

26.     <u>Counterparts</u>.

26.1    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by electronic means shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by electronic means to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

27.     <u>Amendment and Waiver</u>.

27.1    Only a writing signed by all parties hereto may amend this Agreement.  No failure or delay in exercising any right hereunder shall impair any such right that Lender may have, nor shall any waiver by Lender hereunder be deemed a waiver of any default or breach subsequently occurring.  Lender's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Lender would otherwise have.

28.     <u>Governing Law</u>.

28.1    This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

28.2    The provisions of this Agreement are expressly subject to approval by the Bankruptcy Court. Borrower shall be responsible for preparing and prosecuting all actions, including motions, adversary proceedings, and applications, which are reasonably necessary to obtain Bankruptcy Court approval of this Agreement. Lender shall have a reasonable opportunity to review any such pleadings before they are filed with the Bankruptcy Court. The Parties consent to the jurisdiction of the Bankruptcy Court to approve, interpret, and adjudicate all disputes arising out of this Agreement.

29.     <u>Venue</u>.

29.1    Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall be instituted in the United States Bankruptcy Court for the Central District of California, Riverside Division (the "**Acceptable Forums**").

BN 28842816v12
106756955v2

29.2     Borrower agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue.  If a proceeding is initiated in any other forum, Borrower waives any right to oppose any motion or application made by Lender to transfer such proceeding to an Acceptable Forum.

30.    **Jury Trial Waiver**.

30.1     **IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY**.

31.    Service of Process.

31.1     Borrower agrees that Lender may effect service of process upon Borrower by regular mail at the address set forth herein or at such other address as may be reflected in the records of Lender, or at the option of Lender by service upon Borrower's agent for the service of process.

32.    Assignment.

32.1     Lender may assign its rights and delegate its duties hereunder.  Upon such assignment, Borrower shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Lender.

33.    Time of the Essence.

33.1     It is agreed that time is of the essence with respect to all payment obligations of the Borrower.

BN 28842816v12
106756955v2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

BORROWER:  **PALO VERDE HEALTHCARE DISTRICT**

By: _____
Name:  Carmela Garnica
Title:   President

LENDER:  **ALLEON CAPITAL PARTNERS, LLC**

By: _____
Name: _____
Title: _____

BN 28842816v12
106756955v2

**EXHIBIT 1.1.17(c)**

**GENERAL RELEASE**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "**Releasor**") hereby forever releases, discharges and acquits Alleon Capital Partners, LLC  (collectively, "**Releasee**"), its parent, directors, shareholders, agents and employees, of and from any and all claims of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in any way connected to or are related to that certain Loan and Security Agreement dated  .

Releasor agrees that the matters released herein are not limited to matters that are known or disclosed.

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and the preparation of this release, or (b) it has knowingly determined that such advice is not needed.

DATED: _____

Individual Releasor:       _____
                           *[Name of individual]*, individually


Entity Releasor:           __

                           By:_____
                           Name: _____
                           Title: _____

BN 28842816v12
106756955v2

EXHIBIT 1, PAGE 48

## EXHIBIT 10.2.2

FORM OF NOTICE TO PAYORS OF GOVERNMENTAL ACCOUNTS

[Letterhead of Borrower]

Date

[Name of individual at Government Payor Intermediary Office]
[Name and address of Government Payor Intermediary Office]

Re:    Notice of Change of Address for Remittances

[1]
PROVIDER FEDERAL TAX ID NO.
PROVIDER NO.]

Ladies and Gentlemen:

Please be advised that in order to facilitate our cash management needs we have opened a new bank account at _____[2] and a post office box with respect to such bank account. Accordingly, until further notice, we hereby request that:

1.    All wire transfers be made directly into our account at:

[3]
[Name of lock box bank]
[Address of lock box bank]
ABA Number:
Account Number:
Telephone Number:

2.    All Explanations of Benefits, remittance advises and other forms of payment, including checks, are to be made to our post office box located at:

[4]
[Lock box bank address]
[Account number]

---

[1] Borrower's name.

[2] Provide name of Borrower's lock box bank.

[3] Name of Borrower.

[4] Name of Borrower.

33 of 34

BN 28842816v12
106756955v2

EXHIBIT 1, PAGE 49

Please continue to direct any questions you may have concerning your contracts and accounts with us to the undersigned.

This change of address is intended to remain in effect until thirty days after you acknowledge receipt of a written notice of change of address.  In order to avoid any erroneous communication any such change of address notice must be executed by the President and countersigned by the Treasurer of our organization along with a copy of a resolution adopted by a vote of our Board of Directors and certified as true and correct by our corporate Secretary.  Upon receipt of any such change of address request notice please forward a copy of it along with your acknowledgment copy to our address set forth in paragraph 1 above for confirmation by us of such direction.

Please acknowledge and return a copy of this letter to us at our new mailing address in the enclosed envelope that has been provided to you for your convenience.  Thank you for your cooperation in the matter.

Very truly yours,

[5]

By:_____

Name: _____

Title: _____


ACKNOWLEDGED BY PAYOR


By:_____

Name: _____

Title: _____

Date: _____


---

[5] Name of Borrower.

34 of 34

BN 28842816v12

106756955v2

Exhibit "2"

B2289-1856 11/29/2023 3:03 PM Received by California Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

For Office Use Only

**-FILED-**

File No.: U230084581022

Date Filed: 11/29/2023

**A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)**
Amy Fong, (916) 653-2799     Acct# 100244293

**B. E-MAIL CONTACT AT SUBMITTER (optional)**

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**     Exempt #6103

California Health Facilities Financing Authority
901 P Street, Room 313
Sacramento, CA 95814

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

(P)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Palo Verde Health Care District | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 250 North First Street | Blythe | CA | 92225 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| California Health Facilities Financing Authority, a public instrumentality of the State of California | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 901 P Street, Suite 313 | Sacramento | CA | 95814 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

All of Debtor's right, title and interest, whether now owned or hereafter acquired, in and to all Medi-Cal checkwrite payments with respect to Medi-Cal reimbursements due to Debtor from the Department of Health Care Services and the accounts and payment intangibles relating to same and the proceeds thereof.

5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box

☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
CA Secretary of State / dba Palo Verde Health Care District ($8,500,000)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

EXHIBIT 2, PAGE 51

Exhibit "3"

**Tinho Mang**

---

| | |
|---|---|
| **From:** | Tinho Mang |
| **Sent:** | Wednesday, December 3, 2025 8:23 PM |
| **To:** | Tinho Mang |
| **Subject:** | FW: VRRP meeting with Palo Verde |

---

**From:** Barber, Sean@DHCS <Sean.Barber@dhcs.ca.gov>
**Sent:** Friday, November 21, 2025 12:11 AM
**To:** Vanessa Burke <Vanessa@burkeconsulting.cpa>; Michael Rose <Michael.rose@paloverdehospital.org>;
Sandra Anaya <sj.anaya@paloverdehospital.org>
**Cc:** Jordan, Michael@DHCS <Michael.Jordan@dhcs.ca.gov>; Davtian, Rafael@DHCS
<Rafael.Davtian@dhcs.ca.gov>; Fox, David@DHCS <David.Fox@dhcs.ca.gov>; Link-Crosier, Matthew@DHCS
<Matthew.Link-Crosier@dhcs.ca.gov>; Coppin, Joanna@DHCS <Joanna.Coppin@dhcs.ca.gov>
**Subject:** RE: VRRP meeting with Palo Verde

Good evening Sandra, Michael, and Vanessa,

Thank you for your letter dated November 19, 2025, and the discussion today, regarding the urgent situation facing Palo
Verde Hospital and your request for the Department of Health Care Services (DHCS) to extend the November 21, 2025,
deadline for Palo Verde Health Care District to provide a voluntary Intergovernmental Transfer (IGT) for the calendar
year (CY) 2024 Voluntary Rate Range Program (VRRP).

We recognize the critical role that Palo Verde Hospital plays in the health care delivery system for Blythe and the
surrounding rural communities. DHCS is committed to supporting access to essential health services in underserved
areas.

DHCS is carefully navigating options to grant an extension of the IGT deadline. In doing so, DHCS must ensure the
integrity of the Medi-Cal program and compliance with federal regulations that prohibit DHCS from accepting IGTs
derived from impermissible sources. For example, federal rules prohibit the use of Medicaid payments as the source of
IGT contributions—a practice known as "recycling." For this reason, DHCS sets its IGT collection deadline prior to the
date the associated Medi-Cal payments are made. The prohibition against recycling may also apply to using a loan as the
source of IGT contributions if Medicaid payments will be used to repay the loan.

**DHCS agrees to extend the IGT deadline for Palo Verde Health Care District to December 11, 2025**, which is the day
before the first date that the associated Medi-Cal payments will be made. We are committed to working closely with
you to implement this extension as effectively as possible; however, DHCS cannot accept an IGT derived from
impermissible sources. In the event that you are able to provide the IGT within the extended timeframe, we may require

EXHIBIT 3, PAGE 52

additional documentation from you demonstrating that the IGT is derived from permissible sources. Please note that we will not consider the bankruptcy court's judgment on the priority of a claim in bankruptcy as sufficient basis for establishing the permissibility of the funds source under federal Medicaid requirements.


Thank you again for your outreach. DHCS will continue to prioritize solutions that protect access to care for vulnerable communities while maintaining the integrity of our programs. Please do not hesitate to contact us should you have further questions or require additional information. If you encounter further difficulties in funding the CY 2024 VRRP IGT, please contact DHCS as soon as possible to discuss additional options as a last resort (e.g. not participating with one or more associated Medi-Cal managed care plans).

Thanks,

**Sean Barber** | Division Chief
Capitated Rates Development
California Department of Health Care Services
(916) 345-8985




-----Original Appointment-----
**From:** Jordan, Michael@DHCS <Michael.Jordan@dhcs.ca.gov>
**Sent:** Thursday, November 20, 2025 8:56 AM
**To:** Jordan, Michael@DHCS; Davtian, Rafael@DHCS; Barber, Sean@DHCS; Fox, David@DHCS; Link-Crosier, Matthew@DHCS; Coppin, Joanna@DHCS; vanessa@burkeconsulting.cpa; Michael Rose; Sandra Anaya
**Subject:** VRRP meeting with Palo Verde
**When:** Thursday, November 20, 2025 11:00 AM-11:25 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

_____

# Microsoft Teams Need help?

# Join the meeting now

Meeting ID: 247 749 892 397 77

EXHIBIT 3, PAGE 53

Passcode: 8ud6V8KR

---

**Dial in by phone**

+1 279-895-6425,,503510468# United States, Sacramento

Find a local number

Phone conference ID: 503 510 468#

For organizers: Meeting options | Reset dial-in PIN

_____

**CONFIDENTIALITY NOTICE:** This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients. If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.

EXHIBIT 3, PAGE 54

Exhibit "4"

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6



**1086 Teaneck Road * Suite 4D * Teaneck, NJ 07666 * P: (201) 340-6138 * F: (201) 340-6343**

***Summary of Indicative Terms and Provisions***
***of Term Loan to Palo Verde Health District (Debtor In Possession)***
*(For Discussion Purposes Only – Not a Commitment to Lend)*
November 24, 2025

This Summary of Indicative Terms and Provisions (this "*Summary*") summarizes the proposed principal terms of a Term Loan (the "Financing") to Palo Verde Health District (Debtor In Possession) ("Borrower"), as proposed by Alleon Capital Partners, LLC ("Lender").  This Summary is not, is not intended to be, and should not be construed as a commitment to lend, nor should it be construed as an attempt to establish all of the terms and conditions relating to the Financing.  It is intended only to be indicative of certain terms and conditions and how the Financing documents might be structured, and it is not intended to preclude negotiations within the general scope of these terms and conditions.  The final documentation regarding the Facility will be subject to approval by Borrower, and the Lender (as hereinafter defined).

**This Term Sheet will expire on November 26, 2025 at 5pm EST.**

**Overview:**

| Borrower | Palo Verde Health District (Debtor In Possession)<br>250 North 1ˢᵗ Street<br>Blythe, CA 92225 |
|---|---|
| Guarantor (s): | N/A |
| Financing | Super priority senior secured term loan to be made to Borrower, as described herein in the section "Description of the Loan" (the "Loan"). |
| Lender | Alleon Capital Partners, LLC and/or its assignees. |
| Closing Date | Expected to be December 10, 2025 |
| Funding Date | Expected to be December 10, 2025 |
| Maturity Date | Expected to be 12 6 Months following the Funding Date. |

**Description of the Loan:**

| Accounts Receivable ("AR") | Intergovernmental Transfer ("IGT") due to Borrower which has not been sold, pledged or assigned, either directly or collaterally, to any other person or entity prior to the date of this Financing. |
|---|---|
| Maximum Amount | $4,000,000 |
| Advance Rate | 50% of the Estimated Collectable Value ("ECV") of AR. |

-1-

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6

*CONFIDENTIAL*

|  |  |
|---|---|
|  | The ECV will be determined by Lender using historical averages and industry standards. |
| Purpose/Use of Proceeds | The proceeds of the Loan would be used by Borrower for working capital. |
| Interest Rate | 2.5% of the advanced amount for every 30-day period. |
| Collateral | Lender shall receive a super priority valid and enforceable lien and security interest in all AR of the Borrower, both now owned and hereafter acquired, and all general intangibles, instruments, depository accounts, documents, and chattel paper associated therewith and proceeds thereof. |
| Control Account | Borrower will establish a deposit account ("Collections Account") maintained by Borrower at a depository bank ("Collections Account Bank") located in the U.S. Borrower, Lender and Collections Account Bank will enter into a Deposit Account Control Agreement providing that the Collections Account Bank agrees to sweep, on a daily or weekly basis, all funds in Collections Account to a bank account of Lender identified therein. |
| Expense Deposit | Borrower agrees to pay Lender an expense deposit (the "Expense Deposit") in the amount of $45,000 ("Expense Deposit Amount") to reimburse Lender for its actual expenses incurred in connection with the origination, review and approval process, as well as attorneys' fees and expenses incurred in the actual documentation of this transaction ("Approval Process Expenses").  Lender will provide a written accounting of all Approval Process Expenses (which accounting shall be conclusive absent manifest error) to Borrower.  That portion of the Expense Deposit equal to the Approval Process Expenses is non-refundable, irrespective of whether the Lender enters into any agreements with Borrower.  To the extent the Approval Process Expenses are less than the Expense Deposit Amount, the balance of the Expense Deposit Amount shall be returned to Borrower upon demand.  To the extent the Approval Process Expenses are in excess of the Expense Deposit Amount, the balance of the Approval Process Expenses shall be paid by Borrower upon request from Lender or from Loan proceeds, unless this transaction does not close as the direct result of Lender's gross negligence or willful misconduct. |
| Origination Fee | 2% of Maximum Amount to be paid by Borrower at closing from loan proceeds. |
| Security | Borrower hereby grants to Lender a security interest in the Collateral to secure its obligations hereunder. |
| Representations | <ul><li>Borrower is a healthcare district under California Health & Safety Code 32000 et seq. duly qualified and properly licensed.</li><li>The Borrower is a California healthcare district duly organized, validly existing and in good standing under the laws of the State of California and was properly licensed and qualified to do business in any state where treatment to qualifying patients occurred.</li><li>Borrower has full power and authority to assign and transfer the aforementioned Accounts Receivable to Lender.</li><li>Borrower holds good and valid legal title to the Accounts Receivable.</li><li>Accounts Receivable is free and clear of any liens or encumbrances.</li><li>The Borrower has not sold, pledged or assigned, either directly or collaterally, any of the Accounts Receivable to any person or entity.</li></ul> |

EXHIBIT 4, PAGE 56

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6

*CONFIDENTIAL*

|  |  |
|---|---|
|  | <ul><li>There are no agreements with any other parties restricting Borrower's rights to assign and transfer the Accounts Receivable.</li><li>Borrower was not in violation of, nor has received notice of any alleged violation of or any citation for noncompliance with, any applicable law relating to the Accounts Receivable.</li><li>Borrower is in material compliance with the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. Section 1320d, et.seq., and regulations promulgated thereunder, as amended from time to time (statute and regulations hereinafter collectively referred to as **"*HIPAA*"**).</li><li>There is no suit, action, or legal, administrative, arbitration or other proceeding or governmental investigation previously, or currently, pending against the Borrower.</li></ul> |
| Conditions | Customary and appropriate for transactions of this nature, including, without limitation, execution and delivery of all Financing documents, receipt of approval from all applicable governmental and judicial authorities, and satisfactory results of background checks for key management personnel. |
| Events of Default; Remedies | Events of default under the Financing documents (collectively, "*Events of Default*") and remedies would be customary and appropriate for transactions of this nature. |
| Indemnity | Subject to any additional exceptions agreed in the Financing documents, Borrower will indemnify and hold harmless Lender and each of their respective affiliates, officers, directors, and employees, agents and advisors from claims and losses relating to the Financing, except that no such person will be indemnified for its income taxes or for costs, expenses or liabilities to the extent incurred by reason of the gross negligence, bad faith or willful misconduct of such person or any other indemnitee. |
| Waivers and Amendments | Amendments and waivers of the provisions of the Financing documents will require the approval of Lender. |
| Governing Law | The Financing documents shall be prepared by counsel to Lender and shall be governed by the internal laws of the State of California. |

[*Document continues with signature pages.*]

- 3 -

EXHIBIT 4, PAGE 57

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6

*CONFIDENTIAL*

If you are in agreement with the foregoing, kindly indicate your acceptance by executing and delivering a copy of this Summary.  As noted above, this Summary is not, and is not intended to be, a binding agreement to provide the Financing.  Rather, this Summary is a confirmation of the intention of the parties to proceed with the transactions contemplated herein, subject to the terms and conditions contained herein, and it does not create a binding obligation on the parties hereto.  This Summary may be executed in one or more counterparts, all of which, taken together shall constitute one and the same instrument.

Very truly yours,

Alleon Capital Partners, LLC.


By:      *Leon Chernyavsky*

Name:      Leon Chernyavsky

Title:      Managing Partner

- 4 -

EXHIBIT 4, PAGE 58

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6



*CONFIDENTIAL*

I hereby acknowledge and agree to the above terms and authorize Lender ~~Factor~~ to obtain credit and background information on myself and my firms.

ACKNOWLEDGED AND AGREED:

**Palo Verde Health District**

TIN:           90-0214335

License #:     NPI# 1194705202

By:            *Carmela Garnica*

Name:          Carmela Garnica

Title:         District Board President

Date:          11/26/2025

- 5 -

EXHIBIT 4, PAGE 59

Docusign Envelope ID: 4E3D76A1-2875-4F3C-9CAA-834EC6818DD6

*CONFIDENTIAL*

### PAYMENT INSTRUCTIONS

Alleon's wiring information is as follows:

Flagstar Bank
360 Hamilton Avenue
White Plains, NY 10606
Routing/ABA: 026013576

Beneficiary:
Alleon Capital Partners, LLC
1086 Teaneck Road, Suite 4D
Teaneck, NJ 07666
Acct No. 1501431199
Ref.: Palo Verde Health District

- 6 -

EXHIBIT 4, PAGE 60

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO POST-PETITION FINANCING AGREEMENT UNDER 11 U.S.C. § 364 AND FOR GRANTING OF A SUPER-PRIORITY LIEN ON PERSONAL PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 5, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **INTERSTED PARTY COURTESY NEF:** Arturo M. Cisneros    arturo@mclaw.org, CACD_ECF@mclaw.org
- **ATTORNEY FOR PROVIDENT BANK, F.S.B.:** Caroline Djang   cdjang@buchalter.com, docket@buchalter.com;lverstegen@buchalter.com
- **ATTORNEY FOR DEBTOR PALO VERDE HEALTHCARE DISTRICT:** Devan De los Reyes ddelosreyes@marshackhays.com, ddelosreyes@ecf.courtdrive.com,alinares@ecf.courtdrive.com
- **ATTORNEY FOR THE US TRUSTEE:** Abram Feuerstein    abram.s.feuerstein@usdoj.gov
- **ATTORNEY FOR DEBTOR PALO VERDE HEALTHCARE DISTRICT:** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR DEBTOR PALO VERDE HEALTHCARE DISTRICT:** Tinho Mang tmang@marshackhays.com, tmang@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com
- **INTERSTED PARTY COURTESY NEF: Susan C Stevenson** sstevenson@psdslaw.com, bonniec@psdslaw.com
- **US TRUSTEE**: United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **___**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 5, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**PRESIDING JUDGE'S COPY – VIA OVERNIGHT MAIL**
HONORABLE SCOTT H. YUN
UNITED STATES BANKRUPTCY COURT
3420 TWELFTH STREET, SUITE 345
RIVERSIDE, CA 92501-3819

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 5, 2025 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

3. **SERVED BY EMAIL:** CONTINUED:

| | | |
|---|---|---|
| **INTERESTED PARTY**<br>U.S. SECRETARY OF HEALTH & HUMAN SERVICES | **INTERESTED PARTY**<br>CENTERS FOR MEDICARE & MEDICAID SERVICES | **INTERESTED PARTY**<br>CALIFORNIA DEPARTMENT OF HEALTHCARE SERVICES |
| **INTERESTED PARTY**<br>INLAND EMPIRE HEALTH PLAN | **INTERESTED PARTY**<br>MOLINA HEALTHCARE OF CALIFORNIA | **INTERESTED PARTY**<br>KAISER PERMANENTE |
| **INTERESTED PARTY**<br>CALIFORNIA HEALTH FACILITIES FINANCINCE AUTHORITY | **INTERESTED PARTY**<br>DELL FINANCIAL SERVICES L.L.C. | **INTERESTED PARTY**<br>OFFICE OF THE UNITED STATES TRUSTEE |
| **INTERESTED PARTY**<br>SIEMENS FINANCIAL SERVICES, INC. | **INTERESTED PARTY**<br>MIDLAND STATES BANK | **INTERESTED PARTY**<br>MCKESSON CORP AND AFFILIATES |
| **INTERESTED PARTY**<br>OLYMPUS AMERICA INC. | **INTERESTED PARTY**<br>MINDRAY CAPITAL | **INTERESTED PARTY**<br>PROVIDENT BANK, F.S. B. |
| **INTERESTED PARTY**<br>BECTON DICKINSON AND COMPANY | | |

3. **SERVED BY OVERNIGHT MAIL:** CONTINUED:

**UST**
OFFICE OF THE U.S. TRUSTEE
3801 UNIVERSITY AVENUE, SUITE 720
RIVERSIDE, CA 92501-3200

**PATIENT CARE OMBUDSMAN**
ROBERT SPLAWN MD, MPH
5101 VICTORIA HILL DRIVE
RIVERSIDE, CA 92506

**INTERESTED PARTY**
THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
HUBERT H. HUMPHREY BUILDING
200 INDEPENDENCE AVENUE, S.W.
WASHINGTON, D.C. 20201

**INTERESTED PARTY**
THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
C/O ELIZABETH KELLEY, ACTING ASSOCIATE GENERAL COUNSEL
200 INDEPENDENCE AVENUE, S.W., ROOM 443
WASHINGTON, DC 20201

**INTERESTED PARTY**
CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 SECURITY BOULEVARD, MAIL STOP DO-01-40
BALTIMORE, MARYLAND 21244-1850

**INTERESTED PARTY**
CENTERS FOR MEDICARE & MEDICAID SERVICES
C/O ELIZABETH KELLEY, ACTING ASSOCIATE GENERAL COUNSEL
200 INDEPENDENCE AVENUE, S.W., ROOM 443
WASHINGTON, DC 20201

**INTERESTED PARTY**
CALIFORNIA DEPARTMENT OF HEALTHCARE SERVICES
OFFICE OF LEGAL SERVICES
MS 0010
P.O. BOX 997413
SACRAMENTO, CA 95899-7413

**INTERESTED PARTY**
CALIFORNIA DEPARTMENT OF PUBLIC HEALTH
OFFICE OF LEGAL SERVICES
1415 L STREET, SUITE 500
SACRAMENTO, CA  95814

**INTERESTED PARTY**
INLAND EMPIRE HEALTH PLAN
C/O SANJAY AUGUSTINE PAUL
10801 6TH ST.
RANCHO CUCAMONGA, CA 91730

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**INTERESTED PARTY**
MOLINA HEALTHCARE OF
CALIFORNIA
C/O JEFFREY DON BARLOW
2180 HARVARD ST STE 400
SACRAMENTO, CA 95815-3327

**INTERESTED PARTY**
MOLINA HEALTHCARE OF
CALIFORNIA
C/O 1505 CORPORATION, CSC -
LAWYERS INCORPORATING SERVICE
2710 GATEWAY OAKS DRIVE
SACRAMENTO, CA 95833

**INTERESTED PARTY**
KAISER PERMANENTE
C/O 1505 CORPORATION, CSC -
LAWYERS INCORPORATING
SERVICE
2710 GATEWAY OAKS DRIVE
SACRAMENTO, CA 95833

**INTERESTED PARTY**
KAISER PERMANENTE
C/O VANESSA MARIE BENAVIDES
ONE KAISER PLAZA
OAKLAND, CA 94612

**INTERESTED PARTY**
CALIFORNIA HEALTH FACILITIES
FINANCING AUTHORITY
MATTHEW C. HEYN, DEPUTY
ATTORNEY GENERAL
CALIFORNIA DEPARTMENT OF
JUSTICE, BUSINESS LITIGATION
SECTION
300 SO. SPRING ST., STE. 1702
LOS ANGELES, CA  90013

**SECURED CREDITOR**
CALIFORNIA HEALTH FACILITIES
FINANCING AUTHORITY, A PUBLIC
INSTRUMENTALITY OF THE STATE
OF CALIFORNIA
C/O CALIFORNIA HEALTH
FACILITIES FINANCING AUTHORITY
901 P STREET, ROOM 313
SACRAMENTO, CA 95814

**SECURED CREDITOR**
DELL FINANCIAL SERVICES L.L.C.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**SECURED CREDITOR**
DELL FINANCIAL SERVICES L.L.C.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
MAIL STOP-RR1DF-23
ONE DELL WAY
ROUND ROCK, TX 78682

**SECURED CREDITOR**
DELL FINANCIAL SERVICES L.L.C.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**ATTORNEY FOR CALIFORNIA
HEALTH FACILITIES FINANCING
AUTHORITY**
DISTRESSED HOSPITAL LOAN
PROGRAM
C/O JEFFERY HERMANN
ORRICK, HERRINGTON &
SUTCLIFFE LLP
355 S. GRAND AVE., SUITE 2700
LOS ANGELES, CA 90071

**SECURED CREDITOR**
MCKESSON CORP AND AFFILIATES
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
9954 MAYLAND DRIVE, SUITE 4000
RICHMOND, VA 23233

**SECURED CREDITOR**
MCKESSON CORPORATION, FOR
ITSELF AND AS COLLATERAL
AGENT FOR EACH OF ITS
AFFILIATES
C/O CSC
2710 GATEWAY OAKS DRIVE,
SUITE 150N
SACRAMENTO, CA 95833
ACCT. #10027767

**SECURED CREDITOR**
MIDLAND STATES BANK
C/O CORPORATION SERVICE
COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703

**SECURED CREDITOR**
MIDLAND STATES BANK
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
7700 BONHOMME AVE, SUITE 300
CLAYTON, MO 63105

**SECURED CREDITOR**
MIDLAND STATES BANK
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
1201 NETWORK CENTER DRIVE
EFFINGHAM, ILLINOIS 62401

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                            **F 9013-3.1.PROOF.SERVICE**

**SECURED CREDITOR**
MINDRAY CAPITAL
C/O CORPORATION SERVICE
COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703

**SECURED CREDITOR**
MINDRAY CAPITAL
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE
SERVICE OF PROCESS
1111 OLD EAGLE SCHOOL RD
WAYNE, PA 19087

**SECURED CREDITOR**
OLYMPUS AMERICA INC.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**SECURED CREDITOR**
OLYMPUS AMERICA INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
3500 CORPORATE PARKWAY
CENTER VALLEY, PA 18034

**SECURED CREDITOR**
OLYMPUS AMERICA INC.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**SECURED CREDITOR**
PROVIDENT BANK, F.S. B.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**SECURED CREDITOR**
PROVIDENT BANK, F.S. B.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
3756 CENTRAL AVENUE
RIVERSIDE, CA 92506

**SECURED CREDITOR**
PROVIDENT BANK, F.S. B.
C/O WOLTERS KLUWER LIEN
SOLUTIONS
P.O. BOX 29071
GLENDALE, CA 912099071

**SECURED CREDITOR**
PROVIDENT BANK, F.S. B.
C/O CAROLINE DJANG
BUCHALTER
18400 VON KARMAN AVENUE,
SUITE 800
IRVINE, CA 92612-0514

**SECURED CREDITOR**
SIEMENS DIAGNOSTICS FINANCE
CO. LLC
C/O CORPORATION SERVICE
COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703

**SECURED CREDITOR**
SIEMENS FINANCIAL SERVICES, INC.
C/O CORPORATION SERVICE
COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703

**SECURED CREDITOR**
SIEMENS FINANCIAL SERVICES,
INC.
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY
OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO
RECEIVE SERVICE OF PROCESS
170 WOOD AVE SOUTH
ISELIN, NJ 08830

**SECURED CREDITOR**
BECTON DICKINSON AND
COMPANY
C/O 1505 CORPORATION, CT
CORPORATION SYSTEM,
REGISTERED AGENT
330 N BRAND BLVD, SUITE 700
GLENDALE, CA 91203

**20 LARGEST CREDITORS**
DR. HOSSAIN SAHLOLBEI
326 W HOBSONWAY
BLYTHE, CA 92225-1640

**RTD 10-16-25 UTF**
**SECURED CREDITOR**
~~MCKESSON CORP AND AFFILIATES~~
~~ATTN: OFFICER, A MANAGING OR~~
~~GENERAL AGENT, OR TO ANY~~
~~OTHER AGENT AUTHORIZED BY~~
~~APPOINTMENT OR LAW TO~~
~~RECEIVE SERVICE OF PROCESS~~
~~4345 SOUTHPOINT BLVD.~~
~~JACKSONVILLE, FL 32216~~

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

**RTD 10-10-25 UTF**
**SECURED CREDITOR**
~~SIEMENS DIAGNOSTICS FINANCE~~
~~CO. LLC~~
~~C/O DILIGENZ~~
~~6500 HARBOR HEIGHTS PKWY~~
~~STE 400~~
~~MUKILTEO, WA 98275~~

**RTD 10-07-25 UTF**
**SECURED CREDITOR**
~~SIEMENS DIAGNOSTICS FINANCE CO.~~
~~LLC~~
~~ATTN: OFFICER, A MANAGING OR~~
~~GENERAL AGENT, OR TO ANY OTHER~~
~~AGENT AUTHORIZED BY~~
~~APPOINTMENT OR LAW TO RECEIVE~~
~~SERVICE OF PROCESS~~
~~1717 DEERFIELD ROAD~~
~~DEERFIELD, IL 60015~~

**RTD 10-14-25 UTF**
**SECURED CREDITOR**
~~SIEMENS FINANCIAL SERVICES,~~
~~INC.~~
~~C/O CSC DILIGENZ, INC.~~
~~6500 HARBOUR HEIGHTS PKWY,~~
~~SUITE 400~~
~~MUKILTEO, WA 98275~~

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**